## Harris Estate.

Argued (Appeals, Nos. 283 and 284) December 6, 1944; argued (Appeal No. 74) January 5, 1944; reargued January 18, 1945. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

370

*Charles J. Biddle,* with him *Eric A. McCouch, Leslie M. Swope* and *Drinker, Biddle & Reath,* for residuary legatees.

*Robert T. McCracken,* with him *Richard E. McDevitt* and *Ulric J. Mengert,* for ancillary guardian.

*George B. Clothier, David F. Maxwell* and *Edmonds, Obermayer & Rebmann,* for domiciliary guardian.

OPINION BY MR. JUSTICE LINN, March 19, 1945:

These appeals require the construction of the will and codicil of Alan Campbell Harris. He was a citizen of the United States, domiciled at Sierre, Canton of Valais, Switzerland; he died June 4, 1941, without issue, survived by his widow, Elsa Treumann Harris. His next of kin are two brothers, residing in the United States. One of them, born in 1870, has no descendants; the other, born in 1880, has four children. Elsa Treumann Harris was born in Germany February 19, 1869, and is now 76 years of age. In 1934, she was declared mentally incompetent in Switzerland and is there con-

fined in an institution for the mentally ill; she is afflicted with dementia præcox, a progressive and incurable disease. Dr. Otto Peyer,[1] counsellor-at-law in Zurich was appointed guardian of her estate. Her "heirs and next of kin", the record states, "are German nationals residing in Germany". The parties agree that Mr. Harris "had the legal right" pursuant to treaty with Switzerland "to provide that his estate should be governed by and distributed in accordance with the laws of his country of origin"; that he was born in the City of Philadelphia and that Pennsylvania shall be regarded as the state of origin.

On November 20, 1940, in Switzerland, he made a will appointing an executor and making specific bequests to various legatees in the total of 375,000 Swiss francs. This will contained no residuary clause and no reference to his wife. On February 3, 1941, he made a codicil, written in French by a Swiss scrivener, disposing of the residue of his estate not dispossed of in the Will of November 20, 1940. This codicil contains a clause about the meaning of which the parties differ: The question is whether the testator made a gift to his wife or whether, without making such a gift, he merely left her to the exercise of such right or rights as the law gave her.

We now have for consideration appeals from two courts; an appeal from an order of the Court of Common Pleas No. 1 of Philadelphia County; and two appeals from a declaratory judgment rendered by the Orphans' Court of Philadelphia County.

After the probate of the will and codicil in Switzerland, an exemplified copy was probated in Philadelphia County and ancillary letters of administration c. t. a.

---

[1] Counsel appeared for Dr. Erwin Henseler and in the brief filed on his behalf say that he is "domiciliary guardian of the estate of decedent's widow, Elsa Treumann Harris, duly appointed and qualified by the appropriate tribunal at Lucerne, Switzerland. He succeeds Dr. Otto Peyer, who previously served as such guardian, and who continues as executor of the decedent's estate in Switzerland."

were granted to Girard Trust Company. The ancillary administrator then filed its petition in Court of Common Pleas No. 1 alleging the incompetency of Elsa Treumann Harris, her guardianship in Switzerland; that testator left real property in Philadelphia and applied for the appointment of an ancillary guardian to care for Mrs. Harris' property in Pennsylvania. The court appointed the Provident Trust Company of Philadelphia to be ancillary guardian of her estate. The ancillary guardian then filed its petition [2] in Court of Common Pleas No. 1 stating that testator's widow had a limited time under the statute in which to elect to take against the will and desiring instructions [3] whether or not to elect on behalf of its ward. Testator's two brothers answered and opposed the petition. After hearing, the court, for reasons stated in its opinion, to be considered later, directed the ancillary guardian not to file an election. The ancillary guardian appealed to this court from that decree and that appeal, No. 74, January Term, 1944, is now before us.

On the first argument of that appeal, it appeared that a proper appreciation of the questions involved and their decision by this court would be aided by the immediate construction of testator's will and codicil by the Orphans' Court of Philadelphia County which had exclusive jurisdiction of the administration by the administrator c. t. a. A petition was therefore filed in the Orphans' Court by the ancillary guardian praying for a declaratory judgment "construing the rights and inter-

---

[2] The petition set forth that "Dr. Otto Peyer, the duly appointed and acting guardian of said Elsa Treumann Harris in Switzerland, has instructed your petitioner to take all steps necessary and proper to protect the rights of said Elsa Treumann Harris to the property of her late husband situated in Pennsylvania or administered by the courts of Pennsylvania."

[3] There is no doubt of the jurisdiction of the Court: see opinion of GEST, J., in *Paul's Estate*, 26 District Reports 1011; Restatement, Conflict of Laws, section 253; Beale, Conflict of Laws, section 249.4.

est of the ward of the petitioner under the will and codicil of Alan Campbell Harris, deceased".[4] A joint answer was filed by testator's brothers, contending that the codicil did "not constitute a gift or legacy or bequest or devise to his wife", and that, on the contrary, he gave his entire estate to them as next of kin and heirs at law. After argument on petition and answer, the Orphans' Court entered a declaratory judgment to the effect that testator had made a bequest and devise to Elsa Treumann Harris. Testator's brothers appealed from that judgment (Nos. 283 and 284, January Term, 1944) and this appeal is now also before us.

We shall deal first with the appeals construing the codicil because, if the Orphans' Court correctly held that the testator gave his wife one-half his estate, the maximum which a widow may elect under Pennsylvania law, the question of election raised in the appeal from the order of the Court of Common Pleas No. 1 is moot for the reason that if she was given one-half by the codicil, she can receive no more by taking against it.

By far the larger part of testator's property consisted of his interest in a testamentary trust created by his grandfather, Thomas H. Powers, who died in 1878, domiciled in Philadelphia, leaving a will probated in Philadelphia. This trust is being administered by the Girard Trust Company. An account filed in the Orphans' Court by the Girard Trust Company, surviving

---

[4] The court was asked to decree that "(a) That the words in the testamentary dispositions of Alan Campbell Harris, deceased, reading 'étant entendue que mon épouse recevra la réserve prévue par la loi, dans la mesure où le droit successoral de mon pays la prévoit' are a gift, legacy and device to his wife of that part of the estate which she would take under the law of Pennsylvania, namely one-half thereof.

"(b) That the will and codicil of Alan Campbell Harris, deceased, provided that his wife should receive that part of his estate which she would take under the law of Pennsylvania and that said provision was effective and operative without the filing by her, or on her behalf, of any election to take against the said will and codicil."

trustee of the estate of Thomas H. Powers, deceased, and awaiting audit, shows that the net worth of the principal of the trust is \$6,835,000, invested in Philadelphia and Pennsylvania securities, personalty and realty. Thomas H. Powers provided that the trust should terminate and distribution be made twenty-one years after the death of the survivor of his grandchildren living at the time of his death. In that trust, on the death of his mother on August 30, 1921, the testator, Alan Campbell Harris, acquired a vested equitable interest in an undivided one-third part of the corpus, subject to an executory limitation [5] on a contingency to be stated, requiring the payment of income to his widow for life in the amount of one-half the income of the third part of the trust. From his interest in this trust, Alan Campbell Harris had been receiving income, at or about the time of his death, at the rate of about \$60,000 a year. The contingency referred to above results from the provision [6] that if any of Thomas H. Powers' grandchildren die without issue and without making testamentary provision for his or her surviving spouse, the trustee shall pay to such surviving spouse for life, out of the the trust income, an

[5] See Restatement, Property, Future Interests, section 46(1) and comments k and l.

[6] Respondent's answer quotes this provision from the Powers Will: ". . . provided always that if any of the said children of my daughter, or issue of any of her deceased children in whom any such share or purpart of a share shall have vested, shall die before the period so appointed for the transfer or delivery of their respective estate leaving a wife or husband him or her surviving, it is my will and I do hereby direct that if such child or issue of a deceased child, shall not have made provision by his or her last will for his or her surviving wife or husband, the aforenamed Trustees shall pay over to the said surviving wife or husband, for her or his respective term of life, such proportion of the net yearly income of the share or purpart of a share vested in her or his deceased husband or wife as would have been due and payable to such widow or relict, if said husband or wife had died intestate and seized or possessed of any part, or all of his or her respective share or purpart of a share of my said residuary estate."

amount equal to one-half the income theretofore payable to such grandchild. That contingency happened if Alan Campbell Harris made no provision for his wife in the codicil, which is the fact to be determined on this appeal.

At the time Alan Campbell Harris made his will and codicil, he also had absolute ownership of property in Pennsylvania valued at about $472,000 and in Switzerland at about $250,000. At that time, Elsa Treumann Harris owned property in Switzerland worth about $60,000, presumably under the administration of the Swiss guardian, and in Pennsylvania worth about $10,-000 and now under the administration of the ancillary guardian. In addition, she was receiving and continues to receive annuities of about $4,000 under trusts created by her husband's relatives in Pennsylvania.

With that brief statement of the situation of the testator, of the natural objects of his bounty, of the property held by him absolutely and as cestui que trust, we come to the construction of the codicil in the appeals from the Orphans' Court.

It is perhaps not surprising that differences have arisen in ascertaining the testator's expressed intention; his "formal wishes" were expressed by a Swiss lawyer who was thinking in French in terms of the Swiss law with which he was familiar and writing a testamentary disposition to be governed by the law of Pennsylvania with which he was not familiar.

What testator meant must be determined by his words. The record contains two translations, one made in Switzerland and filed with the exemplification of the will and codicil, and the other made in the Swiss consulate in Philadelphia. They are [7]

---

[7] The original is: "1. Le droit de mon pays d'origine sera seul (règle mot biffé) applicable à ma succession.

"2. Pour autant que je n'en ai pas disposé autrement, ma succession entière reviendra entièrement à mes parents aux Etats-Unis d'Amérique, étant entendue que mon épouse recevra *la réserve* prévue

"2. Unless I have otherwise disposed my whole succession is to go entirely to my relatives in the United States of America, it being understood that my wife shall receive the *compulsory portion* as provided by law in proportion as the successional law of my country prescribes . . . This is the expression of my formal wishes."

"2. As much as I have not disposed otherwise, my whole estate shall revert entirely to my relatives in the United States of America, it being understood that my wife shall receive the *compulsory portion,* provided for by the Law, in the measure provided for by the Estate Law of my country . . . Such is the expression of my formal (explicit) will."

The learned court below said, "The sole question to be determined is what share, if any, the widow is entitled to receive by virtue of the phrase 'shall receive the *compulsory portion,* provided for by the Law'." After so stating the question for decision, the learned court held that ". . . these words constitute a testamentary gift to the widow of the share of her husband's estate she would be entitled to receive under the Intestate Laws of this State . . ." The court said the clause " 'She shall receive' is construed as expressing, 'I give, devise and bequeath'."

The contention made on behalf of testator's brothers, in opposition to that conclusion, is that he intended, by what he said, to give them the entire residue of his estate and that he added parenthetically that, while giving his brothers the entire residue, he understood that his widow had a right under the law of Pennsylvania with which he could not interfere.

---

par la loi, dans la mesure ou le droit successoral de mon pays la prévoit. . . .

"Telle est l'expression de ma volonté formelle."

We must reject the construction suggested by the learned court below. The codicil begins with testator's election to have the law of his country applied. He then referred, in the first line of paragraph 2 (by the words "Unless I have otherwise disposed") to the fact that he had not disposed of his entire estate by his will. He then proceeded in the same sentence to dispose of the entire residue by describing it as "my whole succession". This "whole succession", he declares, "is to go entirely to my relatives", etc. (according to one translation), and according to the other, "shall revert entirely to my relatives", etc. If he had stopped there, it must have been conceded, that he had given his brothers all his property. He then continued the sentence by saying, "it being understood" that his wife had some right or rights by "the successional law" or "the estate law" of his country. This is nothing more than a recognition by him of the existence of such rights. As the learned court below has read a different meaning out of the clause, we must resolve the uncertainty by the aid of rules of construction. The question of construction then becomes: How is the clearly stated, absolute gift to his brothers of the entire residue to be affected by the uncertainty and ambiguity of the next clause in the same sentence? The rule is that a testator may by words, standing alone, give an absolute estate and then, by subsequent words, may cut down that absolute estate, but such a reduction in quantum may be made only by words clearly and unambiguously requiring that result: *Chestnut v. Chestnut,* 300 Pa. 146, 151 A. 339; *Haydon's Estate,* 334 Pa. 403, 6 A. 2d 581; *Byrne's Estate,* 320 Pa. 513, 181 A. 500. We think such words are lacking in this codicil. The learned court construed the words my wife "shall receive" the "compulsory portion" as if testator had written, "I give, devise and bequeath the compulsory portion . . ." If we adopt that reading, we must read the single sentence as saying that the "whole succession", *"shall revert entirely"* to my brothers but out of the

"whole succession" given to them, I withdraw part and "give, devise and bequeath" to my wife so much thereof as corresponds to what is known in Swiss law as the "compulsory portion" which one spouse must leave to a surviving spouse. But without more apt words than those employed by the testator, the court has no authority to reduce the direction that the whole residue is to "revert entirely" to his relatives.

When we consider the position of the clause in the sentence of which it is part, and take account of the structure of the sentence and the purpose of the scrivener, we think the clause cannot be regarded as having been intended to make a gift under the law of Pennsylvania. It is not important that the translator, in rendering the future tense of the verb "receive", used the auxiliary "shall" instead of "will".[8] The testator, having just given his entire residue, was adding that, with respect to the "compulsory portion",[9] his wife should be relegated to her rights under the law of Pennsylvania. The next inquiry must be: What are those rights? In Pennsylvania, there *is* no "compulsory portion"; that term is the translation of the technical term in the Swiss law, *"la réserve"*, which, according to the expert who

[8] Any standard French-English grammar will show "shall" or "will" interchangeably used as the future third person singular. A comparison of the two translations of the codicil shows that the translators apparently made no distinction. In the first paragraph, the words *"sera seul applicable"* are translated by one as *"will* alone be applicable" and by the other *"shall* alone be applicable; in the second paragraph the words *"reviendra entièrement"* is translated by one *"is* to go entirely" and by the other *"shall* revert entirely."

[9] The Swiss Civil Code provides: Title XIV—Dispositions Mortis Causa. Second Section—Freedom of Disposition. Section 470. "Whoever leaves issue, parents or brothers and sisters or a spouse, as his next heirs, can make a disposition *mortis causa* of his property saving the (compulsory) statutory share (*Pflichteil*). If he leaves none of the mentioned heirs, he can dispose of his whole property." Official Publication of the Comparative Law Bureau of the American Bar Association. (1915).

testified in the proceeding in the Common Pleas, means property which a husband, leaving a wife, may not give to someone else and which, notwithstanding his attempt to do so, remains her property and which her trustee in bankruptcy can seize for account of her creditors. The term "compulsory portion" has no counterpart in Pennsylvania law.

Not only have we no such "compulsory portion" in this State, but the only right the widow has is the right to elect. It is a mere personal privilege and is not property: *Fleming's Estate,* 217 Pa. 610, 66 A. 874. A widow cannot be required to elect by her creditors or anyone else: *Fleming's Estate,* 217 Pa. 610, 66 A. 874. Unexercised by her, the right does not pass by her will or under the intestate law:[10] *Anderson's Estate,* 185 Pa. 174, 39 A. 818. If she is mentally incompetent, her guardian cannot elect without authority of the court, as will appear later in our opinion disposing of the appeal No. 74. If testator, by using the words "compulsory portion" intended to make a gift of the quantum of property his wife could elect to take by the law of Pennsylvania, he could have made the gift in fewer words than the scrivener used in the entire clause; he might have said, I give my wife such portion of my estate as she can elect to take against my will. It is significant that he did not; and still more significant that the prior provision that his "whole succession" his "whole estate" "is to go entirely to my relatives", etc., shows that he did not intend to make such a gift to his wife. We must of course reject the contention that in the context, there is something donative in the verb translated "shall re-

---

[10] See, generally, Wills Act of 1917, P. L. 403, as amended by the Act of July 8, 1935, P. L. 611, 20 PS section 262; the opinion by Justice MITCHELL in *Cunningham's Estate,* 137 Pa. 621, 20 A. 714; *Armstrong Estate,* 347 Pa. 23, 26, 31 A. 2d 528, 529; *Minnich's Estate,* 288 Pa. 354, 136 A. 236; *Arnold's Estate,* 249 Pa. 348, 94 A. 1076; *McClintock's Estate,* 240 Pa. 543, 27 A. 703. See also Judge GEST's opinion in *Paczosa's Estate,* 9 D. & C. Rep. 706.

ceive". That argument merely substitutes for the auxiliary "shall" the word "must",[11] and leaves untouched what, if anything, was given.

We have been referred to cases in which testator measured his gift by describing it as the portion of his estate which a surviving widow had the right to elect. For example, in *Morris's Estate*, 298 Pa. 25, 147 A. 840, the testator gave his wife "so much of my estate as she could claim under the intestate laws of the State of Pennsylvania", and left the balance of his property to his business partners. In *Carrell's Estate*, 264 Pa. 140, 107 A. 664, testator gave his wife "the interest in my estate that the intestate laws of the State of Pennsylvania directs". Of this provision we said, "It gives to the widow such interest in the estate as the intestate laws of the state direct; in other words, such interest as she would be entitled to receive in case he were to die intestate". These gifts were considered to be clearly and unambiguously expressed. The same thing is true in *Erk's Estate*, 311 Pa. 185, 166 A. 656. The testator gave his wife such portion of his estate as "is required by Pennsylvania law but not more". The meaning of those words was made clear by other provisions in the same will, as reference to the original record will show; the gift to his wife was followed by a gift to his brother of the balance remaining after deducting the gifts previously made to his wife and another. The intention to make a gift measured by the extent of the right which she might exercise was thus clearly expressed in the will. These and similar cases are of no assistance in resolving the uncertainty and ambiguity of the parenthetical clause in the codicil now under consideration.

In the construction of an ambiguous testamentary provision, all the circumstances confronting the testator when he made his will may be considered. Chief Jus-

---

[11] If he had intended to say that she "must receive" he would not have used the form "la recevra" but would have used another expression, perhaps "devra recevoir."

tice MAXEY, in *Jackson's Estate,* 337 Pa. 561, 565, 12 A. 2d 338, said: "Among the accredited canons which are applied in interpreting wills which do not unmistakably reveal the maker's intention, are the following: (1) 'The law will impute to a testator's words such a meaning as, under all the circumstances, will conform to his probable intention and be most agreeable to reason and justice': *Johnson v. Brasington,* 156 N. Y. 181, 185, 50 N. E. 859. (2) 'In determining the testator's intention the court should place itself as nearly as possible in his position, and hence . . . should take into consideration the situation of the testator and the facts and circumstances surrounding him at the time the will was executed . . . the state of the property devised, the amount and character of the property of the testator when he made his will (*McGlathery's Est.,* 311 Pa. 351, 166 A. 886) and 'the testator's relation to the beneficiaries, their condition or necessities . . .'" See also *Miller's Estate,* 323 Pa. 9, 186 A. 99; *Hermann's Estate,* 220 Pa. 52, 69 A. 285; *Frisbie's Estate,* 266 Pa. 574, 109 A. 663; *Brooklyn Trust Co. v. Warrington,* 277 Pa. 204, 120 A. 825; *Mayer's Estate,* 289 Pa. 407, 137 A. 627; *Sterrett's Estate,* 322 Pa. 300, 185 A. 214; *Wanamaker's Estate,* 312 Pa. 362, 167 A. 592; *Lerch's Estate,* 309 Pa. 23, 159 A. 868; *Conner's Estate,* 346 Pa. 271, 29 A. 2d 514.

The federal estate tax situation was a circumstance that would properly have weight with him in deciding whether his wife would be more richly left by a testamentary gift to her or by allowing to happen the contingency provided for in the trust created by his grandfather to the effect that on failure of a grandchild to provide by will for his or her childless spouse, such surviving spouse should receive for life one half the income received by the grandchild. Testator's interest in the trust estate, said to be valued at over $2,000,000.00 is subject to inheritance and estate taxes in a very large amount. If his widow receives the income under the

conditional gift of the grandfather, she will receive a large income from that trust—one-half of what her husband had been receiving. As his grandfather died in 1878, testator would assume that this benefit to his widow would not be subject to estate taxes not at that time in existence. As she is now 76 years old, she can never, by taking against the will, enjoy the trust principal not distributable until 21 years after the death of her husband's brother. Testator was thus confronted with the problem (1) of giving her half his estate by will subject to an estate tax burden that might leave nothing payable to her for the years during which it was necessary to obtain out of the trust the funds to meet the estate tax burden, or (2) of refraining from making a gift and thereby allowing her at once to receive the grandfather's gift of one-half the annual income of testator's interest in the trust created by the grandfather. Altogether apart from the result of the analysis of the codicil made earlier in this opinion conclusively showing that no gift was made to the widow, we cannot believe that the testator, confronted with those alternatives presented by the tax situation, intended, by the words of the parenthetical clause, to leave his widow without income from his or his grandfather's property for any considerable period; on the contrary, we think he intended by what he said, to make no gift to his widow and that, in any event, he would have refrained from doing so for the very purpose of enabling her immediately to receive the income provided by the grandfather's will.

Appeal No. 74.

The question for decision on this appeal is whether there was abuse of judicial discretion in refusing to direct the ancillary guardian to elect to take against the will and codicil. The relevant facts have been stated in the appeals from the Orphans' Court.

It is firmly established that the committee of a lunatic or the guardian of a weak-minded person cannot

elect on behalf of the ward to take against the will of the latter's spouse unless empowered to do so by the court: *Kennedy v. Johnston,* 65 Pa. 451; *Arnold's Estate,* 249 Pa. 348, 363, 94 A. 1076, 1081; *Brooke's Estate,* 279 Pa. 341, 344, 123 A. 786, 787; *Stockton's Estate,* 311 Pa. 189, 166 A. 648; *German's Case,* 318 Pa. 200, 178 A. 38; *Gerlach's Estate,* 127 Pa. Superior Ct. 293, 300, 301, 193 A. 467, 470, 471. It is exclusively for the court, which is the real guardian of the incompetent, to determine whether such an election should be made, and well defined principles have been laid down as guides for the exercise of its discretionary power. Chief among these is that the leaning of the law is toward the will: *Kennedy v. Johnston,* 65 Pa. 451, 454, 455; *In re Bringhurst; Fidelity Trust Co.'s Appeal,* 250 Pa. 9, 13, 95 A. 320, 321; *Stockton's Estate,* 311 Pa. 189, 191, 166 A. 648. The reason for this doctrine is that the intentions of a testator should not be defeated, unnecessarily, by judicial action, for every person, generally speaking, has the right to dispose of his estate according to his own wishes and therefore his will should be upheld as far as possible. It is common knowledge that not every widow disregards her husband's last wishes for the disposition of his property merely because she would obtain a greater quantum of his estate by so doing; sentiment enters into such situations quite as much as considerations of material advantage, and, if she is reasonably provided for in her husband's will or her wants are otherwise adequately supplied, it does not follow, just because such provision may not be as much as she might elect, that she would file an election to take against his will. Therefore, when the court acts on behalf of a mentally defective widow it should not be controlled by mere mathematical calculations of the financial results that would accrue to her one way or the other.

Another principle frequently stated is that, while the court should base its decision on the consideration of all the circumstances (*Kennedy v. Johnston,* 65 Pa.

451, 455; *Stockton's Estate*, 311 Pa. 189, 191, 166 A. 648; *German's Case*, 318 Pa. 200, 203, 178 A. 38, 40), the welfare of the widow is the main object of such consideration, and therefore the interests of her creditors or heirs who might either benefit or suffer by the choice to be made are almost wholly immaterial in the determination of the question. If the needs of the incompetent are satisfactorily provided for, the court should not authorize an election which would result in diverting the property of the deceased husband from his own heirs or legatee to those of his widow: *In re Bringhurst; Fidelity Trust Co.'s Appeal*, 250 Pa. 9, 14, 95 A. 320, 321; *Brooke's Estate*, 279 Pa. 341, 343, 123 A. 786, 787; *Stockton's Estate*, 311 Pa. 189, 166 A. 648; see also *Miller's Estate*, 9 D. & C. 657. An election to take against the will in this case would not only divert property owned absolutely by her husband, which for convenience may be designated as his estate, but would also divert a large interest in the corpus of the trust created by Thomas H. Powers which, for present purposes may be referred to as the grandfather's estate. If an election to take against the will were authorized, the widow would thereby obtain one-half of her husband's estate, such half having a value of approximately $360,000, and she would also become entitled to an annual income for life of about $30,000, that being half of what he had been receiving from the grandfather's estate and to a half share of his vested interest in the principal of that estate, such half having a value of approximately $1,-140,000 but not receivable by her because not distributable [12] until the termination of the trust twenty-one years after the death of the survivor of her husband's brothers. All this property would be subject to estate taxes that would quite certainly absorb the $360,000 and materially reduce the annual income from the trust. As she would not live to enjoy any part of the principal

---

[12] It does not appear that the trust is subject to termination on the application of the widow: *Bowers' Trust Estate*, 346 Pa. 85, 29 A. 2d 519.

of the grandfather's ultimately distributable estate, it is obvious that all that could be obtained for her own benefit by taking against the will, would be half the annual income received by her husband, reduced, as has been said, by the taxes payable out of her husband's estate. On the other hand she is more than well provided for by not taking against the will. She has $70,000 in principal; receives $4,100 a year in income from trusts created by her husband's relatives, and will receive the annual income (perhaps $30,000) from that portion of the grandfather's estate vested in her husband subject to the conditional limitation.

In summarizing the case the learned court below well said: "The court cannot in this situation properly take that course which would create for the incompetent a large estate of which she could by no possibility have the present benefit in her lifetime, but which ultimately would go to her next of kin sometime in the distant future. The primary consideration is the current welfare of the incompetent herself, and the court's discretion in the matter must be so exercised as to serve that purpose. Of course, if it were necessary, in order to assure the incompetent of sufficient income adequately to care for her, to elect to take against her husband's will, the court would so direct, notwithstanding that as a consequence thereof some benefit would accrue to her next of kin on her death. However, if adequate provision for the incompetent is made either by the will or there are other sources of assured income for the incompetent, the court may not properly direct the guardian to take against the will, which would result in diverting a part of the principal estate to strangers of the blood of the testator. All the more true is this, when related to an interest which the deceased husband had in another estate, to wit, that of his grandfather, from the blood of whom the incompetent's next of kin would be that much further removed. The court cannot properly divert the estate of the incompetent's husband's

grandfather from his own blood unless there were a compelling necessity to do so. . . ."

We find no abuse of discretion.

Numbers 283 and 284. The judgment is reversed and it is now declared that Alan Campbell Harris, by his will and codicil, made no gift, legacy or devise to his wife, Elsa Treumann Harris.

Number 74. Order affirmed.

In each case the costs shall be paid out of the principal of the estate of Allan Campbell Harris.

CONCURRING OPINION BY MR. CHIEF JUSTICE MAXEY:

I concur in the majority opinion. I neither find nor "create" an ambiguity in the codicil, nor do I "reform the testamentary disposition." I have no difficulty in discovering the testamentary intention in the language the testator used.

As Justice STEARNE concedes in his dissent, in Pennsylvania "there exists no legal requirements for obligatory shares to the surviving spouse." As the majority opinion points out, a widow's "right" to take against her husband's will is merely "a personal privilege." It is "not an asset" of the wife's estate "or a right which" she "can be compelled to exercise." *Fleming's Estate,* 217 Pa. 610, 615, 66 A. 874.

When Alan Campbell Harris had a French scrivener write this codicil, he was obviously under the impression that there was a certain portion of his estate which Pennsylvania law would immediately upon his death "compulsorily" divert to his widow. This impression was erroneous.

The question comes to this: What was the *state of mind* of Harris toward his wife's sharing of his estate: Did he consciously *will* that his wife should have (as the dissenting opinion holds) "a share in his estate, as measured by the Pennsylvania Intestate Act of June 7, 1917," or was his attitude of mind that of *submission* to what he "understood" would be the state's action re-

gardless of his wish? There is a vast difference between the mental state of *willing* a thing and of *submitting* to it. There is exactly the same difference between them as there is in the mental state of a man who *wills his own destruction* and commits suicide and the mental state of a man who merely *recognizes the fact* that for him death is inevitable and is *resigned* to it. He does not want or will death, but he "understands" that some day death will be his "compulsory portion."

Careful consideration of Harris' codicil convinces me that he did not will his widow anything, but that as far as his volition was determinative of the matter, his "whole succession" would "go" to his "relatives in the United States." His statement as to the "compulsory portion" which he "understood" his wife would receive merely amounted to his saying that "whatever portion of my estate the law of Pennsylvania gives to my wife, let it go, I cannot do anything about it." As to what that portion would be, he apparently knew nothing and cared little, for he believed it as much beyond *his* control as the "compulsory portion" of his estate which would be consumed in paying inheritance taxes.

We are asked to interpret this codicil as though it read: "I devise and bequeath to my wife such share of my estate as would be hers under the laws of Pennsylvania had I died intestate." For us to *thus* "interpret" this codicil is to *re-write* it. We would be no more justified in *so* interpreting what this testator wrote than we would be justified in interpreting as a *bequest* to the United States of America and to Pennsylvania the following if it had been found in the testator's codicil: "My whole estate not otherwise disposed of shall revert entirely to my relatives in the United States of America, it being understood by me that my estate is compelled to pay certain inheritance taxes to the governments of both the United States and of Pennsylvania." A testator who makes a *bequest* must make it "animo testandi," that is, with a deliberate intention to make it. A testator

who declares that he "understands" (or "it is understood") that the law compels a part of his estate to go to the government is not *bequeathing* anything to the government. He is merely yielding to "vis major," like a man who submits to the demands of the tax collector. It cannot be correctly said that such a man is "giving" his money to the collector. If, for example, a man in obedience to a court order pays his deserted wife one hundred dollars a month, it is a perversion of language to call those payments "gifts." I think it does equal violence to language to construe as a *bequest* what this testator said about his wife receiving "the compulsory portion . . . as the successional law of my country prescribes." The words "compulsory" and "prescribes" negative the idea of the testator exercising volition in the matter. Where there is no volition there is no "will."

If this testator really wished his widow to receive that substantial share of his estate which under the law of Pennsylvania is allocated to the widow of a man dying intestate, he could have died intestate (after providing for the specific bequests made in his will), or he could have said in apt language that he willed to his widow that share of his estate which the laws of Pennsylvania declare shall be inherited by the widow of a man dying intestate. That this testator knew how to make *bequests* is shown by the bequests of money totalling $90,000 which he made in his *will* written in English.

*Instead of* this testator's saying that he *bequeathed* a certain share of his estate to his widow, he simply said in effect: I understand that regardless of what I say, the American law "compels" a portion of my estate to go to my wife. As to this he was mistaken. The compulsion he thought he saw was only conditional, and the condition which would make the "compulsion" operative never came into being. It is not the law standing by itself, but the law *coupled with the widow's election to take against the will* which compels the allocation of a certain portion of a testator's property to his widow.

When the widow is mentally incapable of making an election, the jurisdictional *sovereignty* speaking through the appropriate officials *decides* whether or not incompetent's guardian *will be allowed* to make the election.

Since Pennsylvania, speaking through an appropriate tribunal, refused the guardian of this widow permission to elect to take against the testator's will, the "compulsion" that this testator envisaged and gracefully yielded to when he made his will is now as nonexistent as it would be had the law giving a widow the right to take against her husband's will been repealed on the day before the testator died.

The words of the codicil show that the testator's "intention" was to bequeath his wife nothing, though he "understood" (or believed) that in spite of anything *he* could say or do the sovereignty which would administer his estate would take a portion of it and give it to his wife. While I find this intent in *the words used* (where testamentary intent *must* be found, if possible), such an intent was also a *reasonable* one under the circumstances. When this codicil was written on February 3, 1941, the testator's wife was 72 years of age and had been for seven years declared "mentally incompetent." Her condition was incurable. Neither the testator nor his wife had any children. *As long as she lived and until her husband should provide for her in his will,* she was in possession of a $30,000 annuity from the estate of her husband's grandfather. Why under these circumstances would the testator wish to bequeath his wife anything, knowing that the real beneficiaries of such a bequest would be her relatives residing in Germany?

It is conceded that the heirs of a widow have no rights under a widow's "right to elect" to take against a husband's will and therefore if a widow dies without exercising her "right to elect," that "right" dies with her and her heirs do not inherit it. The widow being mentally incompetent cannot elect to take against her husband's will; and this Commonwealth speaking through

its judiciary denied her guardian authority to elect to take against this will because it concluded that owing to the provisions of the will of the testator's grandfather, this mentally incompetent woman's "current welfare" would be better served by her continuing to receive the large income from the estate of that grandfather than by electing to take against her husband's will and thereby (according to the terms of the grandfather's will) deprive herself of further income from the grandfather's estate. That the widow's *kindred* would ultimately be enriched by permitting this widow's guardian to take against the husband's will was a consideration to which the court which had the guardian's request before it properly refused to give any weight. With their interest the court had no concern. Considering only the widow's interest the court declined to authorize her guardian to take against the will and we therefore have a situation exactly as if the widow was of sound mind and had herself decided not to take against her husband's will.

In the case of *Fidelity Trust Co.'s Appeal*, 250 Pa. 9, 95 A. 320, this court declared: "That in cases of this character the first consideration is the welfare of the widow". . . and "where, as here, the wife was confined in an asylum before the time of her husband's death, and he provided for her with a full understanding of the circumstances". . . and "where it is found that the income which she will receive under the will is amply sufficient properly to provide for her comfortable maintenance and support". . . "we cannot say that, where the avowed purpose is to divert part of the property away from these grandchildren to the adopted children of certain of the testator's daughters, the court abused its discretion in refusing permission to take against the will. . . ." The statement of Judge HUNTER, quoted in the dissenting opinion, is most apt here: "The right of a committee in lunacy to take against a will is . . . within the sound discretion of the court. . . . The leaning of the law is in

favor of the will, particularly where a taking against it would divert the estate of the deceased from his own blood."

That the testator did not wish to bequeath anything to his widow is indicated by his will dated November 20, 1940, in which he made no mention of his wife. Forty-four days later he executed the codicil. It is a reasonable inference that during those forty-four days he somehow came to the "understanding" that under the law of Pennsylvania his wife would be allocated a portion of his estate regardless of his wishes. He then wrote the codicil declaring his "will" as to where his "whole succession" should "entirely go." The phrase which he added about "the compulsory portion" was merely his way of saying "I am not so *un*informed as not to know that despite any wishes or will of mine my wife *can* lay claim to a part of my estate."

It is said that under the Swiss law a share of the husband's estate goes to his wife regardless of any action on her part, and it is argued that this testator understood that the laws of Pennsylvania operated in the same way. If such was his understanding, it is immaterial to the issue before us. We apply the Pennsylvania law *as it is,* not as some non-resident *thought it was.* If, for example, Switzerland had a law expropriating 80% of the estate of a Swiss citizen dying childless, and this testator then residing in Switzerland "understood" that Pennsylvania had an inheritance tax law exactly like the Swiss law it could not be held that if he had said "I understand that the law of Pennsylvania compels a large portion of my estate to be distributed to that state," he *thereby bequeathed 80%* of his estate to Pennsylvania. A testator's erroneous conception of the *"compellable"* cannot be judicially translated into a *testamentary bequest.*

Since the widow takes nothing under this will unless an election is made for her, the whole question comes to this: Did the court below after carefully considering the

matter abuse its discretion in refusing permission to the guardian of this mentally incompetent aged woman to take against the will? The majority opinion has demonstrated that it did not but that, on the contrary, its action will promote the "current welfare" of this woman during the presumably brief allotment of life now remaining to her.[1]

When in writing this codicil Harris focused his mind on (1) the "whole succession" which he had not otherwise disposed of, and (2) his "relatives in the United States" his will (i. e., his volition) was operative. When he focused his mind on the wife who might survive him and on her interest in his estate, his will was *not* operative at all, for he understood that as to her "compulsory portion" of his estate, the will of the *country of his origin*" would be *exclusively operative* to just the extent that country's law prescribes. I agree that "the codicil does not *dis*inherit the widow," but I am equally certain that it does not *"in*herit" her. It leaves her in respect to her husband's estate exactly where the law of Pennsylvania places the mentally incompetent widow of a man dying *testate*. As to his wife and her share in his estate if she survived him, Harris' attitude was passive. When a man intends that his widow shall without any action on her part come into possession of that portion of his estate which would be hers if he died without a will he testamentarily says so in apt words or else dies *in*testate. This testator did neither.

The majority interpretation gives effect, I believe, to what was in the testator's mind when he wrote this codicil and only by a *strained* construction of the latter can the view be upheld that "what testator intended to do primarily was to take his estate out from the operation

---

[1] It is not necessary to discuss the phrase which ended the codicil, to-wit: "This is the expression of my formal wishes." This was obviously a stereotyped phrase which is merely the equivalent of the phrase which begins most American wills and which reads as follows: "I [name] hereby make this my last will and testament."

of the Swiss law and to substitute the provisions of the Pennsylvania Intestate Act."

DISSENTING OPINION BY MR. JUSTICE ALLEN M. STEARNE:

I am in complete disagreement with this decision.

Testator, by his will and codicil, in plain and unambiguous language, bequeathed to his widow a share in his estate as measured by the Pennsylvania Intestate Act of June 7, 1917, P. L. 429, 20 PS section 1. The majority reject this interpretation. They *create* a supposed ambiguity in the language of the codicil where none exists. They then *reform* the testamentary disposition. An *implied* intent is attributed to testator to disinherit his widow, with an added supposed expression of knowledge on his part that his widow could elect to take against the will. Finally they deny permission to the guardian of the widow, a mental incompetent, to elect to take against the will and receive her intestate share. The entire estate is passed to testator's two brothers, next of kin, to the exclusion of the widow. Such an extraordinary construction and such approval of the exercise of judicial discretion have no sound basis for support.

Testator was a citizen of the Commonwealth of Pennsylvania, domiciled in Switzerland. He was survived by his widow, who resides in Switzerland, and by two brothers, who reside in America, his only heirs and next of kin. Both the will and codicil were executed in Switzerland.

Before analyzing the *words* of these testamentary writings, it is necessary to consider the surrounding circumstances under which they were executed. The Swiss law of succession must be compared with the Pennsylvania Wills and Intestate Acts. It was established by expert legal testimony that in Switzerland an estate of a person domiciled therein passes *by law,* irrespective of testamentary direction, to "issue, parents,

or brothers or sisters or a spouse" in prescribed shares. These are known as "compulsory portions". While the record is silent as to *amount* of such shares, it was testified ". . . the law which designates the heirs also determines the distributive shares of such heirs and also the manner in which such shares shall be calculated." It was also proved that if testamentary dispositions impinge upon the statutory shares of the spouse, issue or next of kin, all excesses must be abated.

In Pennsylvania, under the Wills Act of June 7, 1917, P. L. 403, 20 PS section 181, there exists no legal requirements for obligatory shares to the surviving spouse, heirs or next of kin. A testator may disinherit any or all of such individuals. However, a surviving spouse is given the personal right, under Section 23 of the Wills Act, to *elect* to take against the will and thereupon is ". . . entitled to such interests in the real and personal estate of the deceased spouse as he or she would have been entitled to had the testator died intestate."

It was also proved that under the law of Switzerland, an alien domiciled in that country (the status of testator) may *"subject his succession to the substantive law of his country of origin."*

The will is dated November 20, 1940, and the codicil February 3, 1941. The will was written by hand in English and is probably holographic. The codicil was written in French by a Swiss notary. The language employed in the codicil reflects the notary's familiarity with Swiss law and terminology, but exhibits his lack of knowledge respecting legal terms and phrases in the Pennsylvania Wills and Intestate Acts. We are therefore required to construe, as one testamentary disposition, a will written in English, with distribution under *Swiss law,* and a codicil to the will, written in French, designed to distribute the estate under *Pennsylvania law.*

We have repeatedly decided that in expounding a will, the *intent* of the testator is the polar star: *Woelp-*

*per's Appeal,* 126 Pa. 562, 17 A. 870; *Scott's Estate,* 313 Pa. 155, 169 A. 73; *Sarver's Estate,* 324 Pa. 349, 188 A. 141; *Prime's Petition,* 335 Pa. 218, 6 A. 2d 530. Also, that the question is not what the testator meant but what is the meaning of his words: *Weidman's Appeal,* 2 Walker 359; *Ludwick's Estate,* 269 Pa. 365, 112 A. 543; *Loughran's Estate,* 144 Pa. Superior Ct. 88, 18 A. 2d 676: The question is confined to the meaning of what testator has said, and does not extend to the consideration of what he might have said, but did not: *Nebinger's Estate,* 185 Pa. 399, 39 A. 1049. A will construction is never to assume the proportions of reformation: *DeSilver's Estate,* 142 Pa. 74, 21 A. 882; *Jacobs' Estate,* 343 Pa. 387, 22 A. 2d 744. While a judge is required to put himself in testator's place to determine intent, the meaning must be ascertained *from the language used,* and not some other possible but undisclosed purpose: *Yate's Estate,* 281 Pa. 178, 126 A. 254; *Conner's Estate,* 346 Pa. 271, 29 A. 2d 514. Conjecture is not permitted to supply what testator has failed to indicate: *Jacobs' Estate,* supra. There is a fundamental distinction between the *nature* of a codicil and that of a later will. A later will works a *revocation,* while a codicil is a *confirmation,* except as to such alterations which it may contain: *Sigel's Estate (No. 1),* 213 Pa. 14, 62 A. 175; *Warne's Estate,* 302 Pa. 386, 153 A. 688; *Wright's Estate,* 68 Pa. Superior Ct. 177. As the purpose of a codicil ordinarily is to modify or add to, and not revoke, it is only permitted to change the will to the extent that it is inconsistent with it: *Whelen's Estate,* 175 Pa. 23, 34 A. 329; *Schattenberg's Estate,* 269 Pa. 90, 112 A. 67; *Chauncey's Estate,* 335 Pa. 73, 5 A. 2d 795. A will and codicil must be construed together as one instrument: *Thomas' Estate,* 241 Pa. 290, 88 A. 499; *Dutton's Estate,* 301 Pa. 94, 151 A. 697; *Moore Estate,* 347 Pa. 276, 32 A. 2d 12; *Jones Estate,* 151 Pa. Superior Ct. 396, 30 A. 2d 241.

With these principles as a guide, the *will* must first be construed to ascertain what interest testator intended

to pass to his widow. The *codicil* must then be examined to determine in what manner and to what extent its language affected the widow's interest already bequeathed to her by the *will*. Both testamentary writings must be construed together.

The probated will bequeathes to named individuals legacies totalling 375,000 Swiss francs, said to be the equivalent of about $90,000. It names an executor *but makes no disposition of the residuary estate*. Because of the absence of a residuary clause, my learned brothers of the majority note in their opinion that the will contains "no reference to his wife", thereby inferring that the testator intentionally or accidentally ignored her. But it is to be observed that neither did the will refer to testator's brothers. There is an obvious reason for this omission. There was no occasion to refer in the will to the "compulsory shares" payable *by law* to the widow and the brothers, as next of kin. The Swiss statutes had already provided for this. *Such disposition was fixed by law and even the testator could not change it*. For the same reason, the statement in the majority opinion that the codicil disposed "of the residue of his estate not disposed of in the will . . ." is not accurate. It is apparent that testator's omission to dispose of his residuary estate was not the accidental omission or failure to forecast events which so frequently appears in wills in which a share remains undisposed of. The present omission was the *deliberate* act of testator. Judge PENROSE, of the Philadelphia Orphans' Court, wrote in *Wunder's Estate*, 13 Dist. Reports 197, 198: "We have no right to assume that the absence of a residuary clause was an accident". See *DeSilver's Estate,* 142 Pa. 74, 21 A. 882; *Nebinger's Estate,* 185 Pa. 399, 403, 39 A. 1049; *Corr's Estate,* 202 Pa. 391, 51 A. 1032. Compare also *Rose v. Quick,* 30 Pa. 225; *Pepper's Estate,* 148 Pa. 5, 23 A. 1039; *Will of Louisa Rorer,* 7 Phila. Reports 524. By necessary implication, testator incorporated the terms of the Swiss statute in his will. Had he died after the execution of the

will, but before the execution of his codicil, the legacies of 375,000 Swiss francs would have been paid and the Swiss compulsory shares would have passed to the widow and the brothers.

An exemplified copy of the probated codicil, written in French as above indicated, with the English translation, is on file in the office of the Register of Wills of Philadelphia. Its dispositive words read: ". . . . *The law of my country of origin will alone . . . . be applicable to my succession. . . . Unless I have otherwise disposed my whole succession is to go entirely to my relatives in the United States of America, it being understood that my wife shall receive the compulsory portion as provided by law in proportion as the successional law of my country prescribes. . . . This is the expression of my formal wishes.*"

According to the Swiss expert, testator, by this language, effectively accomplished his purpose to distribute his estate according to the laws of the Commonwealth of Pennsylvania instead of under the statutes of Switzerland.

As I construe the words of the codicil, what testator intended to do primarily was to take his estate out from the operation of the Swiss law and to substitute the provisions of the *Pennsylvania Intestate Act.* He first *conditioned* his testamentary dispositions by the words: "Unless I have otherwise disposed. . . ." This referred to the bequests of 375,000 francs in his will. Testator says his *whole succession* is to go entirely to his relatives in the United States of America. But he makes another *condition* to that bequest, viz.: ". . . *it being understood that my wife shall receive the compulsory portion as provided by law . . . . in proportion as the successional law of my country prescribes. . . .*" Even though written in French, by a Swiss notary, employing terms not ordinarily found in a Pennsylvania legal vocabulary, testator expressed his intent with remarkable clarity. In *Heckman's Estate,* 299 Pa. 369, 149 A. 646, the entire es-

tate was bequeathed to children, *"subject to dower for my wife."* We held that such words were equivalent to an absolute bequest to the wife. See also: *Carrell's Estate,* 264 Pa. 140, 107 A. 664; *Morris's Estate,* 298 Pa. 25, 147 A. 840; *Erk's Estate,* 311 Pa. 185, 166 A. 656. As testator substituted Pennsylvania law for Swiss law, I can attribute no other meaning to his words than a plain and unequivocal gift, of a Pennsylvania intestate share of the residue to his widow. This construction coincides with the unanimous opinion of the six judges of the Orphans' Court of Philadelphia County. Had this view been adopted, all further considerations would have been moot.

The majority reject this construction. They decide an ambiguity exists in the language, which enables them to declare testator's *presumed* intent.

Before examining the assigned reasons for the existence of an ambiguity, it should be borne in mind that, after all, it is *only an ambiguity* which is asserted. The codicil does not, in terms, disinherit the widow. Testator by his codicil substituted the law of Pennsylvania for that of Switzerland. By his will testator passed to his widow a statutory share *under the Swiss law.* To take away from the widow her commensurate share, as measured by the substituted Pennsylvania Intestate Act, requires more than a *supposed ambiguity.* It cannot be done by inference or surmise. Plainly expressed, unequivocal terms are required. The correct statement of the law, which is applicable by analogy, is found in the majority's opinion: "The rule is that a testator may by words, standing alone, give an absolute estate and then, by subsequent words, may cut down that absolute estate, *but such a reduction in quantum may be made only by words clearly and unambiguously requiring that result"* (italics mine).

As I view the majority's construction, they have *created* an ambiguity where none exists, and have then attributed to testator a *supposed intent* in actual hostility

with his plainly expressed intent. See: *Bruckman's Estate*, 195 Pa. 363, 370, 45 A. 1078. When testator said "The law of my country of origin will alone . . . be applicable to my succession" and "my wife shall receive the *compulsory portion* as provided by law in proportion as the successional law of my country prescribes", it is difficult for me to comprehend how the testator's dispositive intent in its relation to a natural and primary object of his bounty can possibly be misunderstood.

In an effort to demonstrate the existence of an ambiguity, the majority minutely dissect the testamentary words and phrases, compare translations, and even parse French verbs. They have discussed the meaning of "dispositive portions" under the Swiss Civil Code. No one disputes the accuracy of what has been thus written. But all of these considerations, taken singly or collectively, do not change to the slightest degree testator's express and unequivocal words that his widow *"shall receive the compulsory portion as provided by law in proportion as the successional law of my country prescribes."*

An attempt is made to create an ambiguity because of the use of the words "compulsory portion". There appears to be but slight difference between the Pennsylvania and Swiss statutes. The Pennsylvania *Intestate Act* prescribes the measure of the intestate shares. These are obligatory and may not be increased or diminished. Under the *Wills Act,* a surviving spouse may elect to take her intestate share in lieu of the share provided for her by the will. In Switzerland, however, the statutory share passes to the widow regardless of testacy or intestacy. It seems most clear that this testator realized that under Pennsylvania law his widow could always demand her intestate rights and therefore regarded such share as "compulsory". Regarding the will as a whole, any distinction in terms appears most narrow. It certainly does not support the assertion of ambiguity.

I am unable to comprehend the involved reasoning of the majority, whereby the testamentary words are construed to *imply* testator's intent to give his wife *nothing* and at the same time to indicate his supposed knowledge that his widow could elect to take against the will. There is nothing in these writings which even remotely suggests such an idea. The majority seat themselves in testator's mythical "arm chair" to seek out the surrounding facts and circumstances under which the writings were executed as an aid to their interpretation. After considering the extent of testator's estate, his family, the wills of his grandfather and mother, taxes, income and many other matters, there is attributed to this sick, aged testator "pinched with the messengers of death", supposed intent relating to matters which, I am positive, from their very statement, testator never considered, or of which he was even capable of remotely comprehending. Indeed, concerning testator's supposed knowledge of the *tax* situation, contrary to what appears in the opinion, counsel for the next of kin frankly concedes in his supplemental brief ". . . *it would be unreasonable to assume that [testator] had in mind the correct solution of all these difficult tax problems."*

Having decided that testator disinherited his widow and indicated that he was aware that his widow could elect to take against the will, the majority reach a conclusion which disinherits the widow, *but prevents her from electing to take against the will.* They approve the action of the majority of the common pleas court in refusing the guardian of the widow the right to make such election. To my mind the action of the common pleas court was a flagrant abuse of judicial discretion. The law has long since emerged from the ancient conception that a married woman was a chattel and could be dismissed by the formality of handing her a slipper. The marriage relation vests in the wife a statutory interest in her husband's real and personal property. Her property rights, once acquired, have always been pro-

tected and defended by the courts. In early times a widow even possessed the "right of quarantine", a right secured to her by Magna Charta, Cap. 7, which permitted her to tarry in the chief house of her husband for forty days until her dower rights were assigned to her Co. Litt. 32b, 34b. A mentally competent widow may freely elect to take against her deceased spouse's will. It is a personal decision, not subject to judicial supervision. But widows frequently acquiesce in the terms of their husband's wills, even though they could have received larger portions under the intestate laws. It is this underlying consideration which is the basis of the requirement that a legal representative of a *mentally incompetent* widow must secure the court's permission to elect in her behalf. I agree with the majority and the cases they cite in support of this principle. It is well stated by Judge HUNTER in his Pennsylvania Orphans' Court Commonplace Book, Vol. 1, page 354: "The right of a committee in lunacy to take against a will is not absolute but is within the sound discretion of the court having control of the lunatic's estate; the leaning of the law is in favor of the will, particularly where a taking against it would divert the estate of the deceased from his own blood; where the individual estate of the lunatic and that bequeathed to her are ample for her needs, leave to elect to take against the will will be denied."

It is to be observed that this statement couples with the sufficiency of the individual estate of the wife the requirement: *"and that bequeathed to her"*. In every case cited by the majority the testator had, by his will, *made adequate provision* for his widow in a measure almost equivalent to her statutory intestate share. In none of the cases was the widow disinherited. But in no reported case which I have discovered, has this principle been applied to allow a widow to be disinherited because she possessed an individual estate of her own, was old, insane and therefore would not be able to enjoy it. Such considerations are, to my mind, wholly unsound and untenable.

An illustration of the *application* of this principle may be shown in the facts of this case. Suppose this Court had construed the will to pass 375,000 francs to legatees and an intestate share in the residue to the incompetent widow. A valid election to take against the will would entitle the widow to receive such interest as she would have taken had her husband died intestate. Thus, she would take a *full* one-half. The 375,000 francs legacies would then be payable out of the other intestate share. See cases cited in Judge Hunter's Commonplace Book, supra, Vol. I, section 12, page 355, et seq. It is highly probable that with an estate of this size, where testator by his will had amply provided for his wife, the court would refuse permission to the guardian of the incompetent widow to elect to take against the will, for the sole purpose of increasing the widow's estate to the extent of one-half of the amount of the legacies, a gain in dollars, of even as much as $45,000.

In the facts of this case, I most emphatically do not agree that it is for the *"welfare of the widow, the main object of . . . consideration"*, that she should be denied her intestate share. The assigned reasons for the exercise of the discretion by the common pleas court denying the guardian the right to elect are in two classes: (1) what the widow will receive from the testator's grandfather's will in case she is disinherited, and (2) what it will cost her in taxes, if she rejects the will (as interpreted) and takes her intestate share.

It is not at all clear to me precisely how many American dollars this widow will receive from the grandfather's trust if it is held, as the majority do, that testator did not "provide" for his widow. It is true that the stipulation states that the widow, in such event, is to receive "one-half the income" which the testator enjoyed in his lifetime, said to be $60,000 per annum. This, of course, would be $30,000. But it is also stated that there will be a probable federal estate tax of $940,300 payable. Counsel for the widow contends that such fed-

eral tax will considerably reduce that income, which is denied by the counsel for the next of kin. In any event, what, if anything, the widow will receive is a matter of serious question.

It was argued with great earnestness by counsel for the brothers that if the widow received her intestate share she would be required to pay federal estate taxes which would consume all her income for the next few years and as the vested remainder would not fall in until 21 years after the decease of a named living person, she would be without income from her husband's estate for such period and hence, probably for the remainder of her life. Counsel for the widow argues to the contrary. Elaborate briefs have been submitted, with highly technical tax calculations. It is apparent that the federal tax question is subject to a wide divergence of opinions. I do not think this Court should essay to pass upon such federal tax matters. Realizing the extremely complicated state of the tax law and tax regulations, I would prefer to allow the responsibility of deciding what was best for the widow to rest with her capable representatives and not be influenced by the arguments of the next of kin who will receive the whole estate to her exclusion.

After much reflection I have formed the opinion that what my learned brothers are really attempting is a *reformation* of a will rather than its *construction*. They have been persuaded that it is desirable to keep this large fortune within the confines of the United States, where it was created, and in the blood of the founder of the fortune. They brush away the rights of the widow because she is seventy-six years of age, insane, and with a life expectancy, at best, of few years; because her wants, relatively small, are sufficiently supplied by her own estate and by her husband's relatives; and because her income might be augmented, in an uncertain amount, if her husband disinherits her. If such *reformation* can be accomplished, the estate is preserved in America and

little harm, the majority consider, is done to the widow. They have accordingly constructed a Procrustean bed out of sound and seasoned legal principles. This is wholly improper. In a will construction the sole inquiry should be to ascertain the true intent of the testator and to enforce the disposition unless unlawful. The testamentary disposition need not coincide with the construing judge's idea of equity and propriety.

This will should not be reformed. The plain and unambiguous gift of an intestate share to the widow should be upheld. To tear down plain, testamentary words and in their stead to erect a top-heavy structure of *supposed* intention, and to refuse permission to the widow to receive her statutory share, is contrary to every established principle of will construction.

I would affirm the definitive decree and declaratory judgment of the orphans' court, and dismiss the order of the common pleas as moot.

Mr. Justice DREW and Mr. Justice JONES concur in this opinion.