## Gay Estate

*Alan R. Squires,* for accountant.
*Albert H. Gold,* for guardian.

BRUNO, *J.,* September 27, 1979—This trust arises under a revocable deed of trust of Eustace Gay, dated December 12, 1974, whereby the settlor transferred the property therein described in trust, to pay the net income, and as much of the principal as the trustee deems advisable, to the settlor for his life and upon his death to pay the net income to his son, Eustace Gay, Jr. The deed contains provisions for the distribution of principal to the son upon his reaching certain ages, but does not contain provisions should the son predecease the settlor or should the son fail to survive to the stated ages.

Eustace Gay was adjudicated an incompetent by decree of court, per Bruno, *J.,* dated November 30, 1978, and Industrial Valley Bank was appointed guardian of his estate.

The trustee has filed his account at the request of the guardian so that the guardian could present a petition captioned "Petition to Terminate a Revocable Trust" to the court for its consideration. A hearing to audit the account and to consider the

petition was held at which both the trustee and an assistant trust officer of the corporate guardian testified. The facts surrounding the decision to seek termination of the trust are not in dispute and can be briefly summarized.

The guardian has in its possession two certificates of deposit in the incompetent's name in trust for his son. It has approximately $15,000 invested in its short term investment fund. It is administering the incompetent's home, being premises 1250 North 12th Street, having a value of $21,000. In addition, it is administering five other parcels of real estate which have been vandalized and which it considers worthless.

The incompetent is currently a resident of the Stephen Smith Home which charges a monthly maintenance fee of approximately $1,300. He receives a montly pension from the Philadelphia Tribune in the amount of $600 and receives monthly Social Security payments in the amount of $474.

As of the date of the filing of the account, the guardian had not asked for nor had it received any income from the trust. If it did receive and administer trust income it would charge an annual income commission of 5 percent on that income. This would be in addition to commissions of 5 percent already being charged on the pensions and other income it receives. If termination were granted, the guardian would reduce its annual income commission charge to 1.5 percent to 2 percent.

The trust has a current market value of approximately $150,000. From the time of its funding to January 31, 1979, it has generated income after disbursements of $21,000. The trustee charges annual income commissions of 5 percent.

The guardian feels that termination of the trust and the transfer of the corpus to it would end the unnecessary duplication of two fiduciaries' efforts, make one fiduciary responsible for Mr. Gay's affairs and, therefore, best serve his interests.

The issues are simply stated: Does this court have the authority to terminate a revocable inter vivos trust of a settlor who has been adjudged an incompetent and transfer the corpus to the incompetent's guardian? If so, is this a proper case for the exercise of that authority? The matter appears to be one of first impression.

Any authority this court has to act in this matter must flow from the doctrine of substitution of judgment. The doctrine was formulated to permit the courts to make support payments to people to whom the incompetent owed no legal duty of support. It seems that it was first expressed in Ex parte Whitbread, 2 Merivale 99, 35 Eng. Reprints 878 (1816), wherein Lord Chancellor Eldon authorized payments from a lunatic's estate for the benefit and support of the lunatic's impoverished brothers and sisters. The payments were authorized not because the lunatic was under any legal duty to support his brothers and sisters nor because the Lord Chancellor had any tender regard for the impecunious siblings. Rather, Lord Eldon thought it was what the lunatic would have done had he the capacity. He reasoned that:

"The Court does nothing wantonly or unnecessarily to alter the Lunatic's property, but on the contrary takes care, for his sake, that, if he recovers, he shall find his estate as nearly as possible in the same condition as he left it, applying the property in the mean time in such manner as the

Court thinks it would have been wise and prudent in the Lunatic himself to apply it, in case he had been capable.

"The difficulty I have had was as to the extent or relationship to which an allowance ought to be granted. I have found instances in which the Court has, in its allowances to the relations of the Lunatic, gone to a further distance than grandchildren—to brothers and other collateral kindred; and if we get to the principle, we find it is not because the parties are next of kin of the Lunatic, or, as such, have any right to an allowance, but because the Court will not refuse to do, for the benefit of the Lunatic, that which it is probable the Lunatic himself would have done."

The wisdom of the Whitbread decision was explicitly recognized in the Commonwealth in Hambleton's Appeal, 102 Pa. 50 (1883). In that case, a wealthy widower arranged for his nephew and his nephew's family to live with him and manage his affairs in return for which the widower provided a salary for the nephew. Sometime thereafter the widower was declared a lunatic and a bank was appointed committee of his estate. The nephew, who continued to live in the widower's household, was appointed committee of his person.

The bank continued to pay the nephew the salary and upon the audit of its account certain next of kin of the widower sought to have the nephew surcharged for the full amount of the salary paid to him. The lower court, on the recommendation of the auditor, imposed a surcharge. On appeal, the Supreme Court reversed the lower court and approved the payments. Mr. Justice Gordon, writing for the court, called the Whitbread decision "a just and sound one" and stated:

"What, then, under the circumstances was the duty of the court? We answer, simply to maintain and carry forward the affairs of William Neal as they were when his mind failed him; to do that which it might reasonably suppose he would have continued to do had he retained his sanity . . . It follows, that the court having charge of the lunatic, should, as far as possible, maintain the circumstances which have produced those habits and associations, forasmuch as they tend so materially to the welfare of its ward." 102 Pa. at 53.

Even the most perfunctory review of the cases decided since Hambleton's Appeal, supra, will reveal that the courts have moved from merely authorizing support payments to making far-reaching and important decisions for incompetents. Indeed, the courts have not hesitated to become actively involved in the management of the affairs of incompetents. Perhaps the best known example of this judicial willingness is the long-established practice of authorizing guardians to file elections to take against their wards' deceased spouses' wills. See Harris Estate, 351 Pa. 368, 41 A. 2d 715 (1945), and the cases cited therein.

A few additional examples of courts managing affairs for incompetents and making decisions for them will suffice. The Supreme Court approved the lower court's appointment of a guardian ad litem in order to contest a will which disinherited the incompetent where it became apparent that the guardian practiced undue influence upon the testator and would not contest the will: Brindle Will, 360 Pa. 53, 60 A. 2d 1 (1948). A court, in a declaratory judgment action, permitted a guardian to file

an intention on the incompetent's behalf to retire, to apply for a retirement allowance, and to elect the manner in which the allowance was to be paid: Moorehead v. Northumberland County Retirement Board, 86 D. & C. 283 (1953). More recently, a court authorized a guardian to make inter vivos transfers from the incompetent's estate so as to reduce the taxes otherwise payable upon the incompetent's death: Groff Estate, 16 Fiduc. Rep. 1 (1965). And a court permitted a guardian to exercise the incompetent's right to invade the principal of the incompetent's husband's life insurance trust: Anderson Estate, 16 Fiduc. Rep. 414 (1966).

Legislative recognition of both the doctrine of substitution of judgment and of the activism shown by the courts was evidenced in 1976 by the enactment of section 5536(b) of the Probate, Estates and Fiduciaries Code of June 30, 1972, P.L. 508, as amended, 20 Pa.C.S.A. §5536.

• • •

It should be noted that section 5536(b), while enumerating ten specific areas in which courts can act, expressly does not limit a court to those enumerated areas.

It is clear, then, that a court of competent jurisdiction can, under the doctrine of substitution of judgment, supervise and manage the estate and affairs of an incompetent to the same extent and degree that an incompetent could were he not suffering from the disability. Accordingly, I find that this court has the authority to terminate a revocable inter vivos trust of an incompetent settlor.

I also find that the instant case is a proper one for the exercise of that authority. The guardian of Mr. Gay has insufficient funds to properly discharge its

obligations to him. Termination of this trust would give the guardian sufficient funds to see to it that Mr. Gay lives his remaining years with dignity. Continuation of the trust would only serve to continue the duplication of efforts of two fiduciaries and would only serve to continue the payment of both guardian's and trustee's fees. That is unnecessary and undesirable.

Accordingly, the trust under deed of Eustace Gay, dated December 12, 1974, as amended March 27, 1975 and April 30, 1975, is hereby terminated and the trustee is ordered to transfer the corpus of the trust to Industrial Valley Bank, guardian of the estate of Eustace Gay, an incompetent.

The account shows a balance of principal of $154,264.28 which, composed as indicated, is awarded, together with a balance of income of $21,273.24 to Industrial Valley Bank, guardian of the estate of Eustace Gay, an incompetent.

The above awards are subject to all payments properly made on account of distribution.

Leave is hereby granted to the accountant to make any and all necessary transfers and assignments.

Accountant will file a schedule of distribution within 90 days of absolute confirmation of this account, certified by counsel to be correct and in conformity with this adjudication, and approved by the guardian. The schedule, when approved by the Auditing Judge, will be made a part hereof.

## ORDER

And now, September 27, 1979, the account is confirmed nisi.