Wharton Appeal.

Argued November 21, 1952. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY and MUSMANNO, JJ.

reargument refused April 28, 1953.

*Charles J. Biddle,* with him *J. Horace Churchman,* for appellant.

*Edward M. David,* with him *Saul, Ewing, Remick & Saul, Edward Paul Smith, Thomas W. Maher* and *John Russell, Jr.,* for appellees.

OPINION BY MR. JUSTICE ALLEN M. STEARNE, April 1, 1953:

The single question raised by the three appeals, which were argued together, concerns the exercise of powers of appointment by Joseph S. Lovering Wharton (hereinafter called Joseph, Sr.), *in his own will,* of appointive trust estates under the respective wills of his first wife's father, of his first wife, of his maternal grandfather and of his mother.

Appellant is Katherine C. Wharton, widow and appointee under the will of her deceased husband, Samuel Brinton Shoemaker Wharton, a son of Joseph, Sr. Under the will of Joseph, Sr., Samuel was given a testamentary power of appointment over the *corpus* of his share of the appointive estates. Upon the death of appellant's husband in 1943, she received, under the power of appointment given her husband, the share of *corpus* which was *then* due. Appellant contends, however, that at the termination of the trusts in 1952, she is also entitled to receive the distributive share of *corpus* of Samuel's trust estate as one of the *"persons . . . who would . . . be entitled to receive the income"* from the appointed trusts under the will of Joseph, Sr. The Orphans' Court of Philadelphia County decided that she was not so entitled and awarded such *corpus* to the persons who were, at the *termination* of the trusts, entitled to receive *income*. The appeals followed.

The principles of law involved are plain. The *factual* situation is complicated because of the necessary

recitals of the various trust provisions. When the applicable facts are marshalled and properly analyzed, most of the difficulties in this will construction are dissipated.

The provisions of the various appointive trust estates may be thus summarized: WASHINGTON BROWN, the father of Joseph, Sr.'s first wife, *Charlotte*, died *January 21, 1869*. He bequeathed a fund in trust for his daughter Charlotte and gave her a testamentary power of appointment. Charlotte appointed a portion of the corpus for the use of her husband, Joseph, Sr. and gave him a testamentary power of appointment. The fund amounted to $38,058.63. JOSEPH S. LOVERING (maternal grandfather of Joseph, Sr.) died *May 8, 1881*. He gave a testamentary power of appointment to his daughter, *Mary L. Wharton* (mother of Joseph, Sr.) over principal which amounted to $72,405.91. The daughter died *July 1, 1897*, and gave a power of appointment to her son, Joseph, Sr. CHARLOTTE BROWN WHARTON (the first wife of Joseph, Sr.) died *September 10, 1886*. She created a trust under her will, wherein she gave her husband, Joseph, Sr. a testamentary power of appointment over a trust fund *of her individual estate* which amounted to $18,-352.11. (This is exclusive of the trust fund under Charlotte Brown Wharton's father's will above recited).

JOSEPH, SR. (*Joseph S. Lovering Wharton*) possessed of an individual estate and also of the testamentary powers of appointment under the trusts above recited, died *March 17, 1931*. By item two of the seventh codicil of his will, he exercised the testamentary powers of appointment in this language: ". . . I give, devise and bequeath the said estates over which I have such powers to my Trustees hereinbefore named, and the survivors or survivor of them, and their successors,

IN TRUST, NEVERTHELESS, to hold, invest and re-invest the same and to apply the same, both principal and income, upon the trusts and for the purposes and in the manner set forth in Item One of this codicil with respect to my residuary estate; . . ." Referring then to said item one, the gist of his testamentary scheme is: *one-half* of the *principal* of the residuary estate was placed in trust to pay the net income for life to his wife, *Amelia Bird Shoemaker Wharton* (Joseph, Sr.'s second wife, who still survives.) Upon Amelia's decease the trust was to continue and the *income* was thereafter to be paid: one-third to his son Charles, one-third to his son Samuel, two-ninths to his son Joseph, Jr., and one-ninth to his grandson, Joseph, 3rd, and at their respective deaths the *corpus* of their shares was to pass under a general testamentary power of appointment granted to each son and the grandson. The remaining *half portion* of the residuary estate (*not subject to Amelia's life estate*), was directed to be held in trust to pay the *income* to the named sons and grandsons of Joseph, Sr., in specified proportions, and upon their deaths to pay the *corpus* in accordance with their respective general testamentary powers of appointment. (Although not presently involved, it is to be noted that from this portion of Joseph, Sr.'s residuary trust estate there was first to be set aside an amount equal in value to the share which each of Joseph, Sr.'s two eldest sons received from their paternal grandfather, Charles W. Wharton, to the exclusion of the third son Samuel, and on which Samuel was to receive the *income* for life with the *corpus* to be paid in accordance with Samuel's testamentary power of appointment.)

As part of the exercise of the various testamentary powers of appointment, Joseph, Sr. directed that in the event that the trusts continued *until twenty-one*

*years* from the date of his death (March 17, 1931) the trusts *in the appointed estates* should then terminate and the *corpus* paid, *"in so far as the same shall not previously have been distributed"* to the persons (other than his wife Amelia) who would then be entitled to receive the *income.* This provision, the construction of which is *the crux of this case,* reads as follows: "PRO-VIDED, NEVERTHELESS, that the trusts created by this Item with respect to the appointed estates shall in any event terminate at the expiration of the period of twenty-one (21) years from and after the date of my death, and the principal of said trusts in so far as the same shall not previously have been distributed according to their terms shall thereupon be distributed and paid over absolutely to the persons, other than my wife, Amelia Bird Shoemaker Wharton, who would then be entitled to receive the income from said trusts if my said wife were then deceased, in the same proportions in which the income would be received by them in such case."

Samuel, the son, who was appellant's husband, died December 13, 1943, leaving no issue. He appointed to his wife, appellant, the *corpus* of his share absolutely. At this date in 1943 the twenty-one years had not yet expired. The trusts had not then terminated and were active. Appellant received (in 1943) one-half of one-third of Joseph, Sr.'s *individual* residuary trust estate. *At Amelia's decease* she will also receive a similar distribution of the remaining half. Joseph, Sr.'s gross estate amounted to $877,972.38 and his residuary estate to $340,608.97, according to the Montgomery County records where the account of the executors was audited and the estate distributed. Appellant also received in distribution in 1943 from the *appointed trusts* the share of her husband, one-half of one-third, *which was not subject to the life estate of Amelia.* Had the

366

trust *not* been terminated at the end of twenty-one years as directed by Joseph, Sr., appellant would have received the *corpus* of the remaining half upon Amelia's death.

But under the provisions of the clause of termination, Amelia's life estate was revoked, as were the sons' and grandson's powers of appointment. At such termination the *corpus* was given to those persons who were then receiving the *income*. The dispute is over this portion, being a half of one-third of the *appointed* estates on which Amelia had theretofore enjoyed a life estate, but which life estate was later revoked and the *corpus* directed to be paid to Joseph, Sr.'s other two sons and grandson to the exclusion of appellant.

Possessing a general power of appointment, Joseph, Sr. could cut down or revoke any absolute interest which he had theretofore given his appointees. We agree that such subsequent provisions require clear and unambiguous language: *Hayden's Estate,* 334 Pa. 403, 6 A. 2d 581; *Harris Estate,* 351 Pa. 368, 41 A. 2d 715; *Keefer Estate,* 353 Pa. 281, 45 A. 2d 31; *O'Reilly Estate,* 371 Pa. 349, 89 A. 2d 513; *Fink v. Stein,* 158 Pa. Superior Ct. 464, 45 A. 2d 249. But the *words* of the proviso are clear and are not ambiguous. The expression of intent is unmistakable. His plain direction was the termination of the trusts at the expiration of twenty-one years, the *revocation* of his wife Amelia's life estate, and the revocation of the powers of appointment given to his sons and grandson. He specifically stated, and therefore must have intended, that the *then recipients of income* should be substituted as recipients of their proportionate shares of *corpus.*

Appellant contends that because she received corpus in 1943 as appointee of her husband Samuel, she thereafter received *income* on such distributed corpus, and therefore possessed the status of a person *"who would*

*then be entitled to receive the income."* Such an argument while ingenious is spurious. Joseph, Sr. unequivocally directed that the income beneficiaries *to which he referred* were those receiving income *"from said trusts".* Income from appellant's own estate was not income from the *trusts.* After appellant received *corpus,* there existed no assurance that she had or would invest it. She was at liberty to spend it. But even if appellant had invested the principal, and received income therefrom, such income did not constitute interest *" from said trusts".* Such income would be fruit from her *individual* funds.

Appellant also contends in effect that a will must be read and considered from its four corners. When so considered she points out that the general or overall scheme and purpose which "oozes from every pore of the Will", indicates that Joseph, Sr. intended *equality* by his appointment and that any son or the grandson was entitled to income for life and at his death possessed a testamentary power of appointment over the corpus of his share. The principle of presumed equality applies only when the language is lacking in clarity and its meaning is uncertain: *Davis's Estate,* 346 Pa. 247, 29 A. 2d 700; *Friday's Estate,* 150 Pa. Superior Ct. 352, 28 A. 2d 332. Joseph, Sr. unquestionably did intend equality but *ONLY until the proviso became effective.* The proviso *revoked* the life estate of his wife Amelia and terminated the trusts as well as the powers of appointment. But in language crystal clear, Joseph, Sr. directed the distribution of corpus except that already distributed, *". . . to the persons, other than my wife, Amelia Bird Shoemaker Wharton, who would then be entitled to receive the income from said trusts if my said wife were then deceased. . . ."* Appellant maintains that because the general scheme was an *equal* distribution Joseph, Sr. did

not intend what his language unequivocally and expressly *stated*. She contends it is not equality to exclude her from a share of the corpus of the appointed estate solely because the corpus of her husband's share had been paid to her *during* the running of the period of twenty-one years, whereas the other sons and grandson receive their shares of corpus solely because they were receiving *income* when the trusts terminated. Even though the claimed equalization had been intended but had been prevented because of the testator's or a scrivener's error of *omission,* such omission may not be supplied by the court: *Rouse Estate,* 369 Pa. 568, 573, 87 A. 2d 281. Nor may a court reform or reconstruct a will: *Jacobs' Estate,* 343 Pa. 387, 392, 22 A. 2d 744. Rules of construction are unnecessary if the intention is clearly expressed: *Hayden's Estate,* 334 Pa. 403, 6 A. 2d 581; *Walker's Estate,* 344 Pa. 576, 26 A. 2d 456; *Brown Estate,* 349 Pa. 23, 36 A. 2d 335. The language of the proviso is clear and unequivocal and therefore needs no consideration of canons of construction.

Upon first consideration it may appear incongruous for Joseph, Sr. to direct that at the expiration of twenty-one years from his death the trusts should terminate, his wife's life estate be revoked and the *corpus* paid to *income* beneficiaries but not to give a proportionate share of *corpus* to the appointee of a deceased son. We agree with the able and eloquent counsel for appellant that "The purpose of the proviso was to avoid a perpetuity." We surmise, but do not decide (because this is not before us), that the proviso *was* motivated by such thought. This illuminates the likely reason for such proviso. The appointed estates were erected respectively in 1869, 1881, 1886 and 1897, the first eighty-three years, the last fifty-five years, and all the appointments of Joseph, Sr. twenty-one years ago. The time fixed by Joseph, Sr. for the ter-

mination of the trusts was *twenty-one years after his death,* which occurred as stated on March 17, 1931. The rule against perpetuities (a rule of public policy against remoteness), is that executory interests must commence *"within the period of a life or lives in being and twenty-one years, allowing for the period of gestation".* In trusts *created by testator* the validity of the disposition is tested by *possible* events, but where created (as here) by a *donee of a testamentary power of appointment,* it is the *fact* and not the possibility which governs. Trusts created after January 1, 1948: Sec. 4 (b), Act of April 24, 1947, P. L. 100, 20 PS 301.4. Remoteness, however, is *measured* from the creation of the power: *Warren's Estate,* 320 Pa. 112, 182 A. 396, and *Harrah Estate,* 364 Pa. 451, 72 A. 2d 587, and the host of cases therein cited. It is *probable* that Joseph, Sr. considered that the life estates and the unexecuted powers of appointment were valid, and would remain so during the period of twenty-one years from his decease. In this again he was probably correct, although we do not pass upon this question because it is not before us. A remainderman must take within the period specified in the rule against perpetuities. Joseph, Sr., doubtless considered the *possibility* that his sons or grandson, through inadvertence or design, *might* violate the rule in the exercise of their *powers of appointment,* and thus invalidate the trust in whole or part. In such event the fund would revert to the estates or next of kin of the *original* donors.

A testator is not required to make an equal division of his estate. He may exclude any one whom he wishes, except a surviving spouse. The reason for the exclusion need not be stated by testator and will not be passed upon by a court. The present testamentary direction in the proviso was expressed in plain and unambiguous language. The will and all the codicils

were obviously drawn by a professional scrivener. Beyond all question, Joseph, Sr.'s intent is skilfully, accurately and ably expressed. Whether or not the *purpose* for the proviso was testator's true intention is immaterial since the language employed, considered in connection with the entire will and all its codicils, is clear and unambiguous. As this Court has so repeatedly decided, in construing a will, the question is not what testator may have meant but the meaning of the language used. In *Farmers Trust Company v. Wilson,* 361 Pa. 43, 63 A. 2d 14, Mr. Justice JONES, speaking for the Court, said p. 46 : "In Weidman's Appeal, 2 Walker 359, 361, 42 Leg. Int. 338 (1885), Mr. Justice TRUNKEY quoted with approval for this court to the effect that 'The question in expounding a will is not what the testator meant, but what is the meaning of his words.' That pronouncement has since been reiterated by the courts of this State many times without question down to the present: e.g., Myers Estate, 351 Pa. 472, 474, 41 A. 2d 570; Rosengarten Estate, 349 Pa. 32, 38, 36 A. 2d 310; Brock Estate, 156 Pa. Superior Ct. 616, 619, 41 A. 2d 347; Tombs Estate, 155 Pa. Superior Ct. 605, 609, 39 A. 2d 367; etc. The principle, of course, does not mean that, where a testator's intention is clear, it may be disregarded on the basis of a literal interpretation of his testamentary words. But, it does mean that a testator's intent is not to be arrived at by the expounder's subjective deductions as to what the testator might have meant, or even perhaps did mean, but did not say: cf. Ludwick's Estate, 269 Pa. 365, 371, 112 A. 543. The scope of the inquiry is limited to the meaning of what the testatrix said." See also *Burpee Estate,* 367 Pa. 329, 80 A. 2d 721; *Shippen Estate,* 170 Pa. Superior Ct. 405, 85 A. 2d 887.

The definitive decrees of distribution in each of the three estates, viz.: Joseph S. Lovering, deceased, Char-

lotte Brown Wharton, deceased, and Washington Brown, deceased, are affirmed at the cost of appellant.

---

DISSENTING OPINION BY MR. JUSTICE JONES:

The interpretation which this court places upon the testamentary writing here involved works to the obvious impairment of the appointment made by one of the testator's three sons. If that is what the testator intended, it would of course be an end of the matter. But such is not the case. The rationale of the construction adopted by the learned court below, and now approved by this court, rests upon what I take to be a patent misconception of the purpose and import of the proviso in Item Two of the testator's Seventh Codicil with respect to the distribution of the one-half of the "appointed estates" after the expiration of twenty-one years from the testator's death during which period the income from such portion was payable to the testator's widow.

The scheme of the Seventh Codicil (which is all that this case is concerned with) was to make an identical disposition of the testator's own residuary estate (in Item One) and the estates over which he had powers of appointment (in Item Two). Thus, in Item Two, he devised and bequeathed to his trustees the estates over which he had powers of appointment "upon the trusts and for the purposes and in the manner set forth in Item One of this codicil with respect to my residuary estate . . . ." To that, he appended a proviso that the trust of the portion of the "appointed estates" under Item Two for the benefit of the widow was to terminate *not* with her death, as in the case of the similar trust for his wife's life under Item One, but *twenty-one years* from the death of the testator. This

arbitrary time limit was undoubtedly injected because of an apprehension on the part of the testator that he might otherwise violate the rule against perpetuities. Out of the wording of that cautionary provision, the majority deduces the construction which gives to the appointee of the testator's son, Samuel, a lesser proportion of the "appointed estates" dealt with in Item Two than the same appointee receives from the testator's residuary estate comprising the trusts under Item One.

Not only does the majority's interpretation of Item Two thus ignore the evident scheme of Item One and Item Two of the Seventh Codicil but it also produces an inequality adverse to Samuel in respect of his exercise of the power of appointment conferred by the testator upon Samuel and his brothers alike. Such an intent is manifestly foreign to what the testator's will and various of his many codicils plainly evidence. Throughout, equality of interest among his sons or their representatives was the testator's guiding beacon. See, for example, the Fourth Codicil of April 9, 1929, where, after giving Samuel $10,000 absolutely, he explained that "in order that the shares of all my said sons shall be *equalized* I make this provision for my said son, S[amuel] Brinton Wharton" (Emphasis supplied) ; or paragraph two of Item One of the Seventh Codicil where the testator, out of his own residuary estate, *equalized* Samuel for bequests which Samuel's brothers had received under the will of their grandfather, Charles W. Wharton, Samuel apparently not having been in being when that will was executed.

The result produced by the majority's interpretation is, moreover, attended by glaring incongruities which are allowed to arise because of no more than the fortuity of Samuel's relatively early death. He was a minor in 1925, as his father's will of March 11th of

that year indicates, but was evidently of age when the Fourth Codicil was executed in 1929. Samuel died testate December 13, 1943. By his will, he devised and bequeathed to his wife, Katherine C. Wharton, absolutely, his entire estate *including that over which he had power of appointment.* The twenty-one years following the death of the testator, Joseph Lovering Wharton, expired on March 17, 1952, with his widow, Amelia, still surviving. Had Amelia died prior to Samuel or had Samuel survived the twenty-one year period following his father's death, it is beyond dispute that Samuel's exercise of his power of appointment under his father's Seventh Codicil would have effectively transmitted to his widow, Katherine, his one-third of the one-half allocation of the "appointed estates" from which Joseph's widow, Amelia, received the income for twenty-one years following his death but no longer. Or, suppose that Samuel, having died when he did, had left to survive him a child or children to whom he had appointed under the power conferred upon him by his father's will, such children would not have taken what represented Samuel's interest in the one-half of the "appointed estates" whereof the widow Amelia had the benefit for the twenty-one year period. Neither the codicil here involved nor any other of Joseph Lovering Wharton's testamentary writings requires an interpretation fraught with such anomalous possibilities.

The thing whereon the construction, which the majority approves, is based is the clause in the proviso in Item Two which states that, upon the termination of the trust for Amelia after twenty-one years from the testator's death, the principal was to be distributed and paid over to the persons "who would then be entitled to receive the income from said trusts if my said wife were then deceased . . . ." The purpose of this provision, as evidenced by the testator's indicated fear

lest he violate the rule against perpetuities in disposing of the appointed estates, was to vest effectually and unequivocally, in possession, the corpus of the trust for Amelia under Item Two upon the expiration of the twenty-one year period following the testator's death. However, the disposition of the corpus of Amelia's trust in the "appointed estates" was actually provided for in Item Two where the testator unqualifiedly subjected such corpus to the same provisions of ultimate disposition as were contained in Item One with respect to his residuary estate. The clause in the proviso upon which the majority rely is by no means so clear or unambiguous as to be capable of cutting down the absolute grants antecedently devised and bequeathed in Item Two: see *Harris Estate,* 351 Pa. 368, 377, 41 A. 2d 715; and *Cross v. Miller,* 290 Pa. 213, 216, 138 A. 822. In short, the proviso was not intended to, nor does it, constitute a limitation upon the interests or powers of the testator's sons. It was correlated to a supposititious basis, namely, the widow then being dead, but that was without reference to any of the sons also being dead. Nowhere in the proviso is there expressed or even suggested any contingency predicated of a son's surviving either Amelia or the twenty-one year period following her husband's death. Admittedly, no such contingency exists with respect to the ultimate disposition of the trust fund for Amelia under Item One.

Nor is it to be overlooked that, while the clause in question contemplates distribution of the principal to those entitled to receive the income, such persons were to receive the principal (the trust being terminated by Amelia's assumed death) " *in the same proportions in which the income would be received by them in such case*" (Emphasis supplied). It is plain enough, under the scheme of the testator's Seventh Codicil, that

Charles would be entitled to but one-third of the income from the trust (lately for Amelia) and that Joseph, Jr., and his son Joseph, 3rd, would, likewise, be entitled aggregately to but one-third of the income of the trust property in question. Who then should receive or be entitled to receive the income from what had been Samuel's interest in the trusts of the appointed estates? None other than his widow, Katherine, by virtue of his testamentary appointment to her. Her receipt of the principal carried with it the right to the income therefrom. The case of *Jacobs' Estate,* 343 Pa. 387, 391-392, 22 A. 2d 744, upon which the learned auditing judge relied, is not presently pertinent. It was there held that bequests of surplus income did not in the testamentary circumstances present constitute a gift of principal. But, here, the situation is precisely the converse. It is too well settled for further argument that a gift of principal automatically carries with it a right to the income which the principal produces. The persons entitled, therefore, to the income from the "appointed estates" upon the termination of the trust for the testator's widow, Amelia, were Charles, Joseph, Jr., and Joseph, 3rd, and Katherine who, by virtue of Samuel's will, received outright his income-producing interest in the trust of the "appointed estates". The proviso cannot justly be read otherwise or properly be accorded any greater effect. There is no basis whatsoever for concluding, as does the majority, that the testator's two sons, surviving Amelia, would each be entitled to one-half of the income from the trust for her in the appointed estates.

The mere fact that Joseph Lovering Wharton gave his sons *general,* and not *special,* powers of appointment over their respective trust allocations of both his residuary estate and the "appointed estates" sufficiently answers the suggestion that perhaps Joseph wished

to restrict the distributees of the "appointed estates" to persons of his blood. Further answer lies in the fact that, as already pointed out, had Samuel survived Amelia or even the twenty-one year period following his father's death, there could be no question that his wife, Katherine (not of the blood), would be entitled to one-third of the one-half of the "appointed estates" lately in trust for Amelia. Finally, why would Joseph Lovering Wharton so restrict Samuel's ultimate disposition by will of the one-third of the one-half of the "appointed estates" in trust for Amelia when he made no such restriction with respect to the one-third of the one-half of his residuary estate in trust for Amelia for life?

I would reverse and remand for the entry of a decree awarding to Samuel's widow, Katherine, by virtue of his absolute appointment, one-third of the one-half of the "appointed estates" held in trust for the testator's widow, Amelia, for the twenty-one year period immediately following his death.

Mr. Justice CHIDSEY joins in this dissent.