## Levin Estate (No. 2)

*C. Leo Sutton* and *William J. Henrich, Jr.,* for exceptant.

*Maximillian J. Klinger,* contra.

BURKE, J., June 7, 1963.—Louis Levin, the decedent, died on February 6, 1962, in Hahnemann Hospital, Philadelphia, Pennsylvania, leaving a writing dated September 29, 1961, purporting to be his last will and testament. In the said writing he named David Brecher and Benjamin Cohen as executors.

The said writing was lodged with the register of wills, at the instance of Maurice J. Klein, Esq., the

scrivener. The other named executor, Benjamin Cohen, refused to join in the petition for probate of the said writing and the issuance of letters testamentary. Brecher then caused the issuance by the register of wills of a citation, directed to Benjamin Cohen, to show cause why the will should not be probated in Philadelphia County.

Cohen retained counsel who entered his appearance de bene esse, and filed an answer resisting probate, alleging that decedent died a domiciliary of Atlantic City, New Jersey. The register of wills, after hearings, entered a decree dismissing the petition, finding as a fact that decedent at the time of his death, was domiciled in New Jersey, which precluded him from entertaining a petition for probate of the proferred writing, and he entered a decree refusing probate. Ethel Levin, surviving spouse of decedent, filed an appeal from the register's decree refusing probate.

The appeal was referred to Judge Lefever as a hearing judge, who heard the case on its merits, and by stipulation of counsel it was agreed that the matter would be tried in the orphans' court on the transcript compiled by the register of wills and argument thereon. The learned hearing judge entered his decree, dated April 2, 1963, in which he found as a fact and concluded as a matter of law, that decedent was not domiciled in Philadelphia, Pennsylvania, at the time of his death, and dismissed the appeal from the decree of the register. His adjudication specifically passed over the procedural question of the citation issued by the register and resolved the case on its merits.

At the time of his death, decedent was 78 years of age, and it is not disputed that he had continuously resided in Philadelphia from 1913 to November 22, 1960, when he sold the cooperative apartment which he had occupied with his wife, Ethel Levin, at 2101 Walnut Street, Philadelphia. Decedent, on October 8,

1960, executed a lease on an unfurnished apartment in Warwick Apartments, Atlantic City, New Jersey, for a period of 19 months, where he resided at the time of his death.

The exceptant takes the position that decedent never acquired a New Jersey domicile, but was domiciled in Philadelphia, Pennsylvania, by reason of his continued patronage of Philadelphia banks; the location of his safe deposit box in Philadelphia; his continued retention of a Philadelphia lawyer and his remaining as a patient in Philadelphia hospitals under the care of Philadelphia physicians.

She further attempts to negate the acquisition of a New Jersey domicile, citing his absences from Atlantic City during a visit to Miami Beach, Florida, from March 10, 1961, to May 19, 1961, and periods of residence with his daughter in Montgomery County, Pennsylvania. On one of his periods of residence with his daughter in 1961, he spent three months during which time he received medical treatment and was hospitalized in Hahnemann Hospital, Philadelphia.

During his lifetime period in 1962 (January 1 to February 6) he was in Atlantic City for only two and one-half days, and during the remaining time he lived with his daughter in Montgomery County, during which time he was a patient in Hahnemann Hospital where he died.

Several witnesses testified as to declarations made by decedent. The resident manager of the cooperative apartment at 2101 Walnut Street, where they had previously lived, said that decedent had expressed to him on several occasions, that he regretted leaving the apartment, but never made an application to return, as required by the rules of the apartment. Other witnesses related decedent's dissatisfaction with the climate in Atlantic City, and also with the apartment where they resided, and that he had inspected other

apartments in Atlantic City with a view to cancellation of his lease.

Decedent's counsel testified that in drafting the submitted writing, without any suggestion by decedent, he omitted a designation of domicile because decedent told him that the climate in Atlantic City was not agreeable and "he intended to return to Philadelphia."

A certified public accountant, who prepared both Federal income and personal property tax returns for decedent, testified that in 1960 or 1961 he changed decedent's address on the tax records from Philadelphia to Atlantic City. A real estate and insurance broker said that, at decedent's request, he changed his stated residence on insurance policies to Atlantic City. Decedent's wife, the exceptant, upon being admitted to the University of Pennsylvania Hospital on July 7, 1961, gave her address as Warwick Apartments, Atlantic City, New Jersey.

The medical records of the American Oncologic Hospital in Philadelphia revealed that decedent received treatment as an out-patient, and his residence was given as Warwick Apartments, Atlantic City, as of October 30, 1961.

The chief assessor of the Personal Property Tax Division of the City of Philadelphia testified that returns of decedent were filed from 1953 to 1960, each of which gave his address as Philadelphia. No 1961 return was filed and the division was advised by decedent's accountant that he was a resident of the Warwick Hotel, Atlantic City.

The medical records of Hahnemann Hospital, Philadelphia, establish that decedent's address, given at the time of his admission on October 22, 1961, was the Warwick Apartments, Atlantic City.

A representative of the Philadelphia Registration Commission testified that its records show that dece-

dent registered as a voter from 2101 Walnut Street, Philadelphia, Pennsylvania, on January 20, 1958, and had voted at primary and general elections in 1958, 1959 and 1960, casting his last ballot from the said address on November 8, 1960. After the 1960 general election, a canvass was made of the list of registered voters at 2101 Walnut Street, which disclosed that decedent was no longer a resident at that address. Communications were twice sent to him at the address of his registration, and when no answer was received, he was stricken from the list.

From an examination of the register of will's transcript, it is abundantly clear that the testimony of exceptant's witnesses, ascribing to it the greatest possible weight, falls far short of meeting the test set down by our Supreme Court in domicile cases, viz: facto et animo. See Dorrance's Estate, 309 Pa. 151; Publicker Estate, 385 Pa. 403. The cumulative effect of such testimony cannot rise to the level of an intention to abandon decedent's Atlantic City domicile, but is limited to declarations of his dissatisfaction with the Atlantic City climate and the facilities supplied by the Warwick Apartments. Any inclination to equate the testimony to an intent is controverted by his expressed interest in obtaining other living quarters in Atlantic City.

In Publicker, supra, the Supreme Court laid down the factors required to effect a change of domicile as (1) physical presence in the place where domicile is alleged to have been acquired, and (2) an intention to make it his home without any fixed or certain purpose to return to his former place of abode. The facts in the instant case bear a striking resemblance to those in Publicker. Certainly, residences in Pennsylvania for short periods of time, attended by medical care, cannot supply the physical presence and intent to permanently establish a home, as required by our decisional law.

The record fully portrays footprints in the sand, which are more articulate than the spoken word, and establish that decedent, on November 22, 1960, abandoned his Philadelphia domicile and immediately acquired a new domicile in Atlantic City, New Jersey.

The opinion of the learned hearing judge, finding as a fact and concluding as a matter of law, that decedent was not domiciled in Pennsylvania at the time of his death, is supported by competent evidence.

For the foregoing reasons the exceptions are dismissed.

## England Estate

The facts appear from the following extracts from the adjudication of

KLEIN, P. J., March 11, 1963.—Thomas Y. England died on January 2, 1908, leaving a will by which, inter alia, he gave and bequeathed the assets described in the fifth, sixth and seventh paragraphs of his will to his executors, in trust "to pay over and distribute the dividends, interest, income and profits received or de-

rived in any way from the moneys, stocks, or property, held by them in trust specified in paragraphs numbered 5, 6 and 7 in this will, quarterly, as follows: (a) one-third thereof to my wife Emma Clarissa England, during all the term of her natural life; (b) the residue thereof (and in the event of the death of my said wife the whole amount so received) quarterly to my three children, James William England, Martha E. Walton and Clarissa E. Landell, or the lawful issue of such of them as may be deceased, such lawful issue to receive such part or share only as his, her, or their deceased parent would have taken if living (free, clear and discharged of their debts, contracts and engagements, alienations and anticipations and of and from all liability therefor and all liens, attachments, executions, or proceedings in the nature thereof) until the death of the last survivor of my said children; Upon the death of the last survivor of my said children I order and direct my executors and trustees or their successors, or substitutes, to pay and distribute the principal of the said trust estate, equally amongst the children of my children, who shall then be living, and the issue of such of them as may be deceased, per stirpes, absolutely and in fee." A copy of the will, certified by counsel to be a true copy, is annexed hereto.

The fund presently accounted for was awarded to the present accountants by adjudication of Gest, J., dated November 20, 1930, and the occasion of the filing of the present account was the death on April 30, 1962, of Clarissa E. Landell, last surviving cestui que trust, and the resulting termination of the trust.

It appears from the statement of proposed distribution that testator was survived by three children, Martha E. Walton, Clarissa England Landell and James W. England, of whom James W. England died on October 29, 1909, leaving to survive him two children, Margaret England and James W. England, Jr., both

of whom are stated to be living and of age. Martha E. Walton died on May 28, 1937, survived by four children, Charles S. Walton, Jr., Thomas E. Walton, Martha Walton Wiedersheim and Joseph W. Walton, all of whom are stated to be living and of age. Clarissa E. Landell, the last survivor of testator's three children, died on April 30, 1962, survived by two children, Clare Landell Stevens and Paul E. Landell, and two grandchildren, Nanine Landell Mersereau and Thomas Coates Landell, children of her son, Coates E. Landell, who predeceased her. All of the children and grandchildren of the said Clarissa E. Landell also appear to be living and of age.

Under the language of the will quoted above, testator directed that, upon the death of the last survivor of his children, his trustees should "pay and distribute the principal of the said trust estate, equally amongst the children of my children, who shall then be living, and the issue of such of them as may be deceased, *per stirpes*, absolutely and in fee." The auditing judge is therefore requested to determine whether distribution of the principal in remainder to testator's surviving grandchildren should be on a per capita or per stirpes basis. If distribution is to be awarded on a per capita basis, each of the surviving grandchildren of the testator would be entitled to receive a one-ninth share of the corpus and the two children of a deceased grandchild would divide a one-ninth share, each being entitled to one-eighteenth of the corpus.

If, on the other hand, it is determined that a stirpital distribution was intended by the language quoted above, Margaret England and James W. England, Jr., children of James W. England, would each be entitled to a one-sixth share of the principal; Charles S. Walton, Jr., Joseph W. Walton, Thomas E. Walton and Martha Walton Wiedersheim, children of Martha E. Walton, would each be entitled to a one-twelfth share

of the principal; Clare Landell Stevens and Paul E. Landell, surviving children of Clarissa E. Landell, would each be entitled to a one-ninth share of the principal in remainder and Nanine Landell Mersereau and Thomas Coates Landell, surviving children of Coates E. Landell, would each be entitled to one-half of one-ninth or one-eighteenth of the principal in remainder.

In the construction of testamentary writings the testator's intention is all-important: Dinkey Estate, 403 Pa. 179, 182 (1961); Hope Estate, 398 Pa. 470 (1960); Bald Estate, 385 Pa. 176 (1956). If the language employed by testator in disposing of his estate is plain and clearly discloses his intention, the will interprets itself, and no rules of construction are necessary to aid in its interpretation: Wood v. Schoen, 216 Pa. 425 (1907). See also Wharton Appeal, 373 Pa. 360 (1953); Haydon's Estate, 334 Pa. 403 (1939). It is a matter of common sense, as well as of law, not to attempt to construe that which needs no construction: Brown Estate, 349 Pa. 23, 26 (1944); Reck's Appeal, 78 Pa. 432 (1875); Rzedzianowski's Estate, 148 Pa. Superior Ct. 361 (1942).

Testator's language in the present case falls squarely within the purview of these truisms. It is so clear, and his intent so plainly evident, that his will interprets itself, leading expressly and inescapably to the conclusion that he intended a *per capita* distribution of principal among grandchildren and a *stirpital* distribution among the issue of deceased grandchildren. Such distribution involves no conflict with the provision in the will for stirpital distribution of income to grandchildren and their issue during the continuance of the trust, i. e., *during the lives of testator's children.* Until the death of his last child, testator obviously, and quite naturally, desired to preserve equality among his children in the distribution of income, as against, or in competition with succeeding

or substitutionary life tenants, viz: the children and issue of deceased children. This is the time-honored, almost universal scheme of testamentary distribution of income prior to the termination of a trust. And this is the natural interpretation of testator's language in the present case.

The contention that testator intended a stirpital distribution among the grandchildren and issue of deceased grandchildren is untenable and does violence to the language of the will.

Let us assume, however, for the sake of argument, and for this purpose only, that some doubt existed concerning testator's intention as to whether the distribution of principal to the grandchildren was to be on a per capita or on a per stirpes basis. Even in such event we can reach no other conclusion than that testator intended the interpretation which we have adopted.

The law is well settled that where the will leaves the mode of distribution doubtful, the court will apply, by analogy, the principles of the intestate statute of distributions: Hunter's Pennsylvania Orphans' Court Commonplace Book, 2d Ed., Vol. 6, p. 255 et seq. See Love Estate, 362 Pa. 105 (1949); Scott's Estate, 163 Pa. 165 (1894); Lenhart's Estate, 344 Pa. 358 (1942). See also McDowell Estate (No. 2), 29 D. & C. 2d 469. In Sipe's Estate, 30 Pa. Superior Ct. 145, 150 (1960), Rice, P. J., said:

"The statute of distributions governs in all cases where there is no will; and where there is one, and the testator's intention is in doubt, the statute is a safe guide: Ashburner's Estate, 159 Pa. 545."

The construction we have adopted comports with the intestate laws of the state in effect when testator died.

". . . a will must be so construed, if possible, as to give effect to every word employed by the testator and a construction which renders any of the words nugatory and futile must be rejected": Vandergrift Estate,

406 Pa. 14, 26 (1962). See also Collins Estate, 393 Pa. 519 (1958); Hollenbaugh Estate, 402 Pa. 256 (1961). We cannot attribute to a testator an intention to write meaningless words into his will, when another construction gives such words intelligent and effective meaning: Irwin's Estate, 304 Pa. 200 (1931). Unless no other conclusion is reasonably possible, an interpretation will not be adopted which makes any of the provisions of a will mere surplusage: Moyer's Estate, 280 Pa. 131 (1924).

Testator directed that the principal be paid and distributed "equally amongst the children of my children, who shall then be living, and the issue of such of them as may be deceased, per stirpes, absolutely and in fee." If we were to award a stirpital distribution we would have to disregard the use of the word "equally". This we cannot do.

In Burleigh Estate, 405 Pa. 373 (1961), in which the testator also used the word "equally", Mr. Chief Justice Bell said at page 379:

". . . 'Equally', prima facie, means as appellants contend, a per capita distribution among the heirs. However, appellants then admit, as they logically and under the authorities must—Love Estate, 362 Pa. 105, 66 A 2d 238—that the word 'equally' means *equally among heirs of the same class*, but the issue of a deceased member of that class would not take equally with the members of the first class, but would take per stirpes."

In Davis' Estate, 319 Pa. 215, 219 (1935), in which the words "divide in equal shares" were used, the court said:

". . . Another circumstance pointing toward an intent that the beneficiaries take per capita is the use of the words 'divide . . . in equal shares.' It is true, as was said in Ashburner's Est., 159 Pa. 545, at page 547, that such words are no less appropriate to a divi-

sion among classes than to a division among individuals. But, in the absence of other language disclosing an intention to distribute stirpitally, the words 'equally to be divided,' 'divided into equal parts,' and the like, ordinarily favor distribution per capita rather than per stirpes: See Bender's App., 3 Grant 210; Hiestand v. Meyer, 150 Pa. 501; Garnier v. Garnier, supra; Brundage's Est., 36 Pa. Superior Ct. 211."

If a stirpital distribution were adopted, the grandchildren, i. e., "the children of my children", would not all receive equal shares. On the contrary, the two surviving children of testator's son, James, would each receive twice as much principal as would their four cousins, who are the children of testator's daughter, Martha, and 50 percent more than each of the children of testator's daughter, Clarissa. It would require far more persuasive arguments than have been advanced in support of stirpital distribution in this case to convince the auditing judge that when testator directed payment of the principal in remainder "equally amongst the children of my children" (all of whom were born in his lifetime, before the execution of his will, and were living at his death), he contemplated such an unequal result.

In paragraph 4 of the will, testator indicated that he knew how to make a clear, unequivocal stirpital gift. He created a trust, the income to be paid to his sister, Mary E. Murphy, for the term of her natural life, and upon her death to pay the principal "to and amongst the children of my said sister, Mary E. Murphy, or the issue of such of them as may be deceased, per stirpes, absolutely and in fee." The word "equally" was not used in making this gift. This is most significant. The change in the phraseology of the later gift to the grandchildren is strong evidence of a different intent: Davis' Estate, 319 Pa. 215 (1935); Reiff v. Pepo, 290 Pa. 508 (1927); Martin v. Grinage,

289 Pa. 473 (1927); Elliott v. Diamond Coal & Coke Company, 230 Pa. 423 (1911).

The testamentary plan in the present case is an entirely natural one. Ordinarily a person has the same degree of affection and love, as a class, for all of his children and grandchildren. Preference for one member of the class is the exception rather than the rule, and to be effective in a will, must be clearly expressed.

In Rosengarten Estate, 349 Pa. 32 (1944), the court said at page 37:

". . . It is not unusual for a parent to give income to his children for life until the death of his last surviving child, and then to give the *corpus* to his grandchildren. Under such a testamentary plan, a gift to grandchildren as a class, of necessity, means a *per capita* distribution. A study of the philosophy underlying this principle will disclose that when a testator makes a gift to a group of individuals of the same class, he is not mentally dividing them stirpitally, and increasing or decreasing their shares depending upon the fecundity of their parent. He is thinking of each member of the class as an *individual*. Thus a gift to grandchildren, nephews, cousins, etc., as a class, connotes an equal share to each individual of the class, i. e.: per capita."

The same general concept was stated in a different way in Esbenshade's Estate, 23 Dist. R. 1069 (1914):

". . . Manifestly the testatrix had nephews and nieces in her mind as the objects of her benefaction, and because they were her nephews and nieces not by reason of them being the children of brothers and sisters. It was their relation to her which guided her purpose. Her affection was not fractionally divided among them. It was not seven times as strong for the only child of one sister as it was for each of seven children of another sister. It was full for each . . ."

In the present case, all nine of Thomas Y. England's grandchildren were born in his lifetime, before the execution of his will, and were alive when he died in 1906. Nothing is contained in his will which remotely suggests that he favored any one of his grandchildren over the others. On the contrary, the plain language of the will clearly reveals that he regarded them alike, as the objects of his bounty, and that he wished them to share "equally" in his estate if they were alive when his last surviving child died.

The parties who argue for a stirpital distribution rely principally upon Wanamaker Estate, 399 Pa. 274 (1960), in which the lower court directed a *per capita* distribution of principal, but was reversed on appeal by a divided Supreme Court. We cannot accept this case as a precedent, or as binding authority, as Chief Justice Bell, who wrote the majority opinion said at page 283:

"However, we agree with the auditing Judge that this will is sui generis, and that no prior decision of this Court governs it. It is therefore unnecessary to analyze or review the authorities cited by appellant or appellee . . ."

Moreover, we regard Marshall Estate, 377 Pa. 41 (1954), and Corr's Estate, 338 Pa. 337 (1940), as inapposite and readily distinguishable from the instant case. We do not regard the fact that the words *per stirpes* were underlined, nor the punctuation used in the paragraph under construction, as material or significant in view of testator's clear and unambiguous directions. . . .

And now, March 11, 1963, the account is confirmed nisi.

*Thomas S. Weary, William H. S. Wells, Samuel W. Morris* and *Minturn T. Wright, III*, for exceptants.

*J. Montgomery Forster, Harold D. Greenwell* and *Wm. Chas. Hogg, Jr.*, contra.