## Ackerman Estate.

Argued January 7, 1959. Before JONES, C. J., MUS-MANNO, JONES, COHEN and McBRIDE, JJ.

*William A. Valentine,* for appellants.

*Andrew Hourigan, Jr.,* with him *George A. Spohrer,* for appellee.

OPINION BY MR. JUSTICE MUSMANNO, March 24, 1959:

On October 16, 1944, Edward J. Ackerman, while apparently on a visit to the bank of the South Side Bank and Trust Company in Scranton, picked up a deposit slip and wrote on its reverse side the following: "Oct. 6, 1944 I Edward J. Ackerman wishes at the time of my death that everything excepted Two Thousand Dollars should go to Helen Schmeig the rest to the Ackerman Trust Estate. Edward J. Ackerman."

On October 31, 1957, he died, without anyone seeming to know of the existence of this paper. Letters of administration were issued to his widow, Helen Ackerman. Later the paper was found in Ackerman's safety deposit box in the same bank where it had been written, and the widow now petitioned the Register of Wills of Orphans' Court to admit the paper to probate as the last will and testament of her late husband. The Register of Wills did so admit the paper and granted letters testamentary C. T. A. to Mrs. Ackerman.

In addition to his widow, Ackerman left three brothers and a sister, namely, George Ackerman, Frank Ackerman, Irving Ackerman and Mrs. Marie Schmieg. These four blood relatives filed a petition with the Orphans' Court of Luzerne County asking that a citation be awarded to Mrs. Ackerman to show cause why the decree admitting to probate the Ackerman writing

as the last will and testament of Edward Ackerman should not be set aside.

When the petition came on for argument in the Orphans' Court of Luzerne County, counsel for the three brothers and sisters and counsel for the widow Helen Ackerman stipulated that if the court sustained the probate, it should construe the will as though the court were entertaining a petition for declaratory judgment. The court did construe the will and arrived at the conclusion that Ackerman intended to leave his entire estate to Helen Schmeig, with the exception of a $2,000 legacy to the Ackerman Trust.

The brothers and sisters contested this construction and appealed to this Court, averring that the Ackerman will was misread by the court below; that the will was never intended to leave the entire estate, minus $2,000, to Helen Schmeig, but that, on the contrary, it gave the corpus of the estate to the Ackerman Trust, minus $2,000 to Helen Schmeig. The widow, of course, stands on the interpretation made by the Orphans' Court.

In maintaining their respective positions, both parties urge us, in effect, to rearrange the sentence structure of the will. But there is no need to alter the architecture of Ackerman's will if we grasp the materials which went into it, and the atmosphere in which it was constructed. We said in *Sterrett's Estate*, 322 Pa. 302, that: "Words have various recognized meanings, and if employed by a testator with particular reference to special circumstances, will be given the meaning intended; if necessary, the court may receive proof of the circumstances to determine the sense in which the words were used." Thus, in reading the will of Edward J. Ackerman, we must interpret it in the light of the circumstances in which it was written.

When Ackerman penned his holographic will he had just recovered or was convalescing from an illness,

during the course of which he had been cared for by a practical nurse named Helen Schmeig. Obviously, he cherished a sense of gratitude, one sometimes referred to as an undying gratitude, toward this person who had rendered him valuable service; and so, he desired that, over and above whatever payment he may have already made to her, she should receive $2,000 at the time of his death.

The Ackerman Trust Estate referred to in the will was described in one of the briefs, and not disputed in the opponent's brief, as follows: "The Ackerman Trust Estate was an inter vivos trust executed on March 30, 1937, by and between the settlor, the widowed mother of the Ackerman children, and said children, including the testator and the four appellants, which was entirely a family trust and of which Edward J. Ackerman, the testator, and his brother George N. Ackerman, one of the appellants, were the trustees."

It would appear that in view of the fact that Ackerman, at the time he wrote his will, was unmarried, his three brothers and sister would be the primary object of his bounty and, therefore, he would naturally desire that they should receive the bulk of his estate. In the Spring of 1957, that is 13 years after execution of the will, Ackerman married Helen Schmeig, and as already stated, he died on October 31, 1957, six months later.

The lower court, in interpreting the will, said: "We think it is clear that the writer of this instrument wanted everything in his estate, except $2,000, to go to Helen Schmieg, who was not then his wife, but who became his wife at a later date."

The casual reference to a "later date" suggests the matter of the passage of several months or possibly a year or two. But it must be emphasized that Ackerman did not marry Miss Schmeig until *13 years* after he had written his will. Even the most indifferent

lover and the most reticent bachelor would scarcely wait 13 years to embrace a fate which he had at a certain moment decided was to be his. History records many delayed marriages, and fiction writers delight to portray willing hearts which wait agonizingly and desperately for the wedding band which never gets around to playing the nuptial march, but it is not consonant with human realism to say that when lover and sweetheart agree to throw their fates together, they will wait thirteen weary years to consummate the dream of their mutual marital adoration. There is nothing in the record to suggest that at the time Ackerman wrote his will he regarded Helen Schmeig romantically. There is nothing to intimate that Helen Schmeig was to him the gratification of a lover's thirst. Any attachment which waits thirteen years to generate can scarcely be regarded as one eager for a conjugal visit to the altar rail and the glittering shower of the traditional rice.

The record would justify the conclusion that when Ackerman wrote his will he entertained toward Helen Schmeig a sentiment no warmer than that which any celibate might feel toward a person of the opposite sex who has done him a service in which the love angle was of that variety which may be attributed to any kind, aged grandmother.

Important as Helen Schmeig's nursing services undoubtedly were, there is nothing to support a theory that, with Ackerman's ideas on economy, he would feel obligated to give Miss Schmeig all the wealth he then owned and might later acquire. With the exception of Androcles's lion, it is doubtful that literature records an expression of gratitude so poetically complete.

It is elementary testamentary law that the intention of a devisor is the polar star [1] in the construction

---

[1] *Byrne's Estate*, 320 Pa. 513.

of wills and that in searching for intention, a will is to be superimposed over the panorama of actuality existing at the time of the will's execution.[2] The strength of a man's vision as of a certain date is measured by what he could see on that day, and not years later when his vision may have been altered or corrected by circumstances which may or may not have been under his control. Thus, there is not the slightest factual reason to support the lower court's supposition that in 1944 Ackerman intended to give all his property to a woman for whom the wedding bells were not to ring until 13 years later.

No logic in human relationship would support the supposition that a person endowed with normal intelligence and sentiment would give all his wealth to a stranger to the blood, and thereby exclude from his bounty all his own blood relatives.

After saying that it was Ackerman's intention to leave everything to Helen Schmeig, the lower court goes on to say: "He directed that 'everything excepted Two Thousand Dollars should go to Helen Schmeig the rest to the Ackerman Trust Estate.' If we read the will to a certain point: 'everything excepted Two Thousand dollars should go to Helen Schmeig,' the meaning is clear." But the will did not stop at that "certain point." The will goes on and says: "the rest to the Ackerman Trust Estate." According to the interpretation by the Orphans Court of Luzerne County, the phrase "the rest" is completely redundant; it is a phrase thrown in superfluously by Ackerman. But it is hard to believe that a thrift-minded testator standing in a bank, writing out a last will on a small bank deposit slip, would add meaningless words to his testamentary disposition. The paucity of language in the instrument and the economy of expression, as well as

---

[2] *Peterson's Estate,* 242 Pa. 330.

paper, reveal that Ackerman meant every word he wrote to count.[3]

In order to arrive at the conclusion reached by the Orphans' Court the will would have to read as follows: "I Edward J. Ackerman wishes at the time of my death that everything should go to Helen Schmeig with the exception of $2,000 which should go to the Ackerman Trust Estate."

But that is not what Ackerman wrote. Nor, as one reflects on the circumstances of the time, is it what he would have any desire to write. Keeping in mind the testator's literary limitations, it is really not difficult to ascertain Ackerman's intent by what he actually wrote. He began: "I Edward J. Ackerman wishes at the time of my death that everything excepted Two Thousand Dollars should go to Helen Schmeig . . .". It is plain that up to this point that, with the exception of $2,000 for Helen Schmeig, he wished everything to go to an unnamed beneficiary. If he had not been so parsimonious with words, paper, and punctuation, he would have placed a comma after "everything" and one after Helen Schmeig, and then there could have been no mistaking his intent. Supplying those commas we have: "I Edward J. Ackerman wishes at the time of my death that everything, excepted Two Thousand Dollars should go to Helen Schmeig, the rest to the Ackerman Trust Estate." Ackerman probably thought that because he paused at the places where commas were required, his meaning would be conveyed by those pauses.

After he said "excepted Two Thousand dollars should go to Helen Schmeig" he was now ready to name the beneficiary of the rest of his estate. It is obvious

---

[3] It could hardly be said that he was afflicted with "linguistic graphomania," a term used by Boris Pasternak in "Doctor Zhivago."

that here he became a little confused. Like an amateur carpenter who does not know whether to drive the waiting nail with one determined blow (taking the chance of distorting or missing it entirely) or to drive it with several short and certain taps, Ackerman at this juncture did not know whether to go straight on and quickly name the over-all beneficiary or to tap experimentally with the strange pen in his hand. He wrote the word "the" and then, in reflection, crossed it out. He was tapping, seeking out the perfect way to drive his nail home. He began afresh and once more wrote "the". He knew that he had said that everything, with the exception of $2,000 was to go to a certain beneficiary, but he wanted to make certain that, after the $2,000 had been paid, the *rest* should go to his brothers and sister, and so he wrote: "the rest to the Ackerman Trust Estate."

There was no more to say. He quickly wrote his name and that ended the will-writing. Even if he were capable of it, which he was not, he indulged in no circumlocution. If he had merely left out the words "should go" there could have been no confusion whatsoever about his meaning. But conscientiously determined that $2,000 *should go* to Helen Schmeig he inserted that phrase in the sweep of a sentence and created a superficial ambiguity. However, while the rhetoric of his English was confused, the grammar of his heart was correct.

The lower court, in attempting to interpret the will, says: "The last phrase 'the rest to the Ackerman Trust Estate' stands in apposition to the phrase 'excepted Two Thousand Dollars.'" But how can "the rest" stand in apposition to its exact opposite "excepted Two Thousand Dollars"?

The Court says further: " 'The rest' can infer [presumably refer] only to the exception, being the phrase

'excepted Two Thousand Dollars.'" How can so clear and ambiguous a phrase as "the rest" be synonomous with an exception?

No matter how involved, involuted, and confused Ackerman's language might be, there could not possibly be any mistake about the significance he intended to give to the words "the rest". "The rest" means what is left, and can only mean that. Webster's International Unabridged Dictionary defines rest: "With *the* that which is left or remains after removal of a part, either in fact or in contemplation; the remainder; residue; the others."

Once there is a statement about distribution, "the rest" can only mean what is left. Whether the distribution be of money, horses, or stock and bonds, *the rest* logically, categorically, and inevitably directs what is left after a part is removed.

The decree of the Orphans' Court of Luzerne County is reversed with directions that a decree be entered in accordance with this opinion. Costs to be borne by the estate.