## Cutler Estate

*Frederick H. Starling*, for appellant.

*Paul I. Guest*, for appellee.

SHOYER, J., December 5, 1961.—Should the decree dated June 20, 1961, by the register of wills admitting to probate a will dated May 1, 1954, be opened to permit him to receive and act upon a petition for probate of a later writing dated September 25, 1960, as a later will or codicil? More particularly, is the later writing prima facie testamentary?

The matter comes up for hearing on petition for citation, answer thereto and reply.

The petition by Mabel Nugent alleges that she is the daughter and sole surviving next of kin of Paul D. Cutler, also known as Paul Cutler and Paul Peter Doll, who died June 14, 1961; that on June 19, 1961, the register of wills granted letters of administration to her on her father's estate, which were subsequently revoked; that on June 20, 1961, a writing bearing date May 1, 1954, and alleged to be the last will and testament of decedent was admitted to probate and letters of administration c. t. a. were thereupon granted by the register of wills on June 20, 1961, to Olive A. Strickland, the beneficiary named in said writing and respondent herein.

The probated document provides: "The amount of money in this Box is to go to Olive A. Strickland #5630 Hadfield Str West Phila. Phone S. A. 9-5019.

This is my request in case of my Death" signed by decedent.

Paragraph 4 of the petition for citation alleges that the probated document is not the last will and testament of decedent, but that decedent executed a later writing dated September 25, 1960, as his last will and testament, a copy of which is attached to the petition; that on July 10, 1961, petitioner filed an appeal from the probate of the earlier writing, entered bond as required, and the record was removed to this court.

The answer filed by Olive A. Strickland denies that Mabel Nugent is decedent's daughter or that she is a party in interest; denies that the writing dated September 25, 1960, is, in fact, a will of decedent, and alleges that it was not prepared or signed on the purported date and is believed not to be authentic. In new matter, the respondent alleges:

"9. Your respondent avers, and expects to be able to prove, that the alleged writing attached to the petition marked Exhibit B is not the last Will and Testament of the decedent, was not prepared by or for him, but was without decedent's knowledge prepared on Super-Speed Smith-Corona typewriter No. 1-A-2157-187-11 and is fraudulent."

Petitioner in her reply avers that the writing dated September 25, 1960, was prepared by decedent on the said typewriter on that date, and denies the other allegations in the new matter.

The controversial writing is as follows:

"To ~~Thomas Dawson, Jr.~~

TO WHOM IT MAY CONCERN. SEPT. 25th. 1960. I WANT MY DAUGHTER MABEL NUGENT TO HAVE MY 15,000 DOLLARS THAT IS IN MY SAFE DEPOSIT BOX.

Paul D. Cutler
WITNESS David S. Thompson".

Mabel Nugent testified that a few days after her father's death, she and her husband removed some small items of furniture and a mirror from her father's rented apartment in Germantown; the mirror, wrapped in blankets, was placed by them in their auto and that weekend was carted down by them to the witness's rooming house in Wildwood, N. J.; that on June 24, 1961, as her husband and a hired hand were hanging the mirror, they noticed "a little brown envelope" (appellant's exhibit no. 1) thumbtacked to the back of the mirror. She further testified that in their presence and in the presence of her maid, Ellen, she opened the envelope and found in it the alleged will (appellant's exhibit no. 2); that she immediately mailed the two exhibits together with the thumbtacks to Frederick H. Starling, Esq. (N. T. pp. 8-20); she identified her father's signature on the proffered writing (N. T. p. 32); the mirror was produced and the witness indicated how the envelope was affixed to it (N. T. pp. 33-5).

David S. Thompson, called as a witness by the appellant, testified that he knew decedent for the past 16 years, during which period they were both employed by the Automatic Fire Alarm Company, and, for the last three and a half years of decedent's life, they both worked the same shift from midnight to 8 a.m.; that in the early morning hours of September 25, 1960, decedent produced some insurance policies and stated that he had not changed the beneficiary on the $1,000 insurance policy on his life from his sister, Marie Booth, to his daughter, "because I wanted to leave the money I had saved to my daughter. That is why I didn't change the policy, because I had some money saved in a safe deposit box, and I want to leave that to her in case anything happens to me" (N. T. p. 54); and that decedent then went into the front office and he was typing in there, and when he

came back he said, "Barney, I made another will out," and he said, "will you read it and witness it for me?" "So I looked at it and I saw he had made a will similar to a will he had made out before. And I said, 'What happened to the other one you made out, Paul, you made another one out?' He said, 'I don't know what happened to it. I was looking through my locker and I can't find it. I must have lost it.' So I witnessed it for him"; and he thereupon identified decedent's penciled signature on appellant's exhibit no. 2 and his own signature as a witness thereon (N. T. pp. 55-6); that, although he did not see decedent sign his name on the alleged later will dated September 25, 1960, decedent in making reference to his signature remarked to Thompson that his penciled signature was ". . . good enough. I can't write so good in ink . . . I am too nervous" (N. T. pp. 56, 72).

Mr. Thompson further testified that on one occasion when he discussed with decedent the advisability of investing the money in decedent's safe deposit box in a savings account, decedent told him he had always promised Mrs. Strickland he would not touch anything unless he notified her, and Mrs. Strickland said it was best not to remove the money (N. T. pp. 60-1); that decedent promised Mrs. Strickland he would not tell his daughter that he was entering the hospital (N. T. pp. 61, 62).

Helen James, the maid, testified (N. T. pp. 20-30) in corroboration of the discovery of the later writing, as did also Thomas A. Nugent (husband of Mabel) (N. T. pp. 73-5).

5 Hunter, Pennsylvania Orphans' Court, Commonplace Book, pp. 165, 166, states the principle: "The Register of Wills has no power to revoke probate or letters testamentary, when a later will or codicil is presented for probate; . . . upon appeal, the Orphans' Court having no original jurisdiction of probate may

not determine finally the validity of the later writing, but upon *prima facie* proof thereof, will open the decrees of probate and grant of letters testamentary, and remit the record for proof and hearing before the Register." See Beatty's Estate, 193 Pa. 304 (1899); Crawford v. Schooley, 217 Pa. 429 (1907); Estate of C. T. Boland, 99 Pa. Superior Ct. 321 (1930); Steiger Estate, 16 D. & C. 2d 79 (1958); Kauffman Estate, 24 D. & C. 2d 343 (1961); Andrews' Estate, 44 Erie 73.

As was observed by President Judge Klein in Steiger Estate, supra, at 83: ". . . we are often confronted with instruments so strange and unorthodox that it is difficult to determine whether they are testamentary or not." This is such a situation. However, our present burden only extends to prima facie proof thereof.

Judge Klein continued (page 83): "Blackstone defined a will as a legal declaration of one's intention which he wills to be performed after his death. In McCune's Estate, 265 Pa. 523 (1920), Mr. Justice Stewart indicated this definition is still the most acceptable one."

Various expressions have been held to express testamentary intent on the part of the maker of the writing: "A few little things I would love to have done" and "Please have just my baptismal names on stones" (Knox's Estate, 131 Pa. 220 (1890)); "My executor" (Wolfe's Estate, 284 Pa. 169 (1925)); "Shoul I dye in the near future" (Davis' Estate, 275 Pa. 126 (1922)); "Wishes at the time of my death": Ackerman Estate, 395 Pa. 179 (1959).

When the later instrument on its face appears to be testamentary, extrinsic evidence as to intent is unnecessary, and the court will direct the opening of the original probate to permit the register to con-

sider and act on the later writing: Kauffman Estate, supra.

On the other hand, when the writing is unambiguous on its face and clearly not testamentary in character, extrinsic evidence is inadmissible to establish it as a will: McCune's Estate, 265 Pa. 523; Sunday's Estate, 167 Pa. 30.

Where, on its face, the instrument is ambiguous as to whether it is or is not of testamentary character, extrinsic evidence as to the intent has been permitted: Kauffman Will, 365 Pa. 555 (1950); Hengen's Estate, 337 Pa. 547; Sellers' Estate, 54 Lanc. 321 (1955).

In Kauffman Will, supra, decedent wrote (p. 555): "dear bill i want you to have farm Annie Kauffman".

The court held that the testimony of one witness was sufficient to resolve the ambiguity created by the writing.

In Hengen's Estate, supra, p. 548, "I want Mamie to have my House 544 George St. M. L. Henge", was held "prima facie" to be a valid codicil.

In Seller's Estate, supra, decedent's penciled writing on the inside of an envelope, "to my sisters i want them to have everything—Walter", was held prima facie testamentary.

In arguing *against* the testamentary character of the disputed writing, respondent here puts much stress on the place where the writing was found. It is pointed out that the writing here was shown to be in an envelope tacked to the back of a mirror which was hanging near the ceiling in decedent's apartment; that, on the other hand, in Kauffman Will, supra, the later writing was entrusted to decedent's daughter for safekeeping; in Hengen's Estate, supra, the writing was found in a drawer with decedent's will and other important papers, and in Jackson v. Tozer, 154 Pa. 223, the disputed writing was found near the body

of decedent who committed suicide. In reply to this contention, appellant argues that Mr. Thompson's uncontradicted testimony establishes that decedent's safe deposit box was in the joint names of *decedent and Mrs. Strickland*, and that decedent had made certain promises to Mrs. Strickland which may have bearing on the secretion of the writing. Be that as it may, its location is only one of the facts that have to do with the question as to whether the writing is or is not testamentary in character.

In view of the foregoing, it is my conclusion that the writing dated September 25, 1960, is, prima facie, testamentary in character and, accordingly, I enter the following

*Decree*

And now, December 5, 1961, the appeal of Mabel Nugent is sustained, and the decree of the register of wills dated June 20, 1961, admitting to probate as the last will and testament of Paul Cutler, also known as Paul D. Cutler, deceased, the writing dated May 1, 1954, which is entered of record as will no. 2131 of 1961, is opened to permit the register of wills to receive and act upon a petition for the probate of a later writing bearing date September 25, 1960, as decedent's last will and testament, and the record is remitted to the register for this purpose.